**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Joshua BOOZE, Appellant.**

Superior Court of Pennsylvania.

Submitted March 17, 2008.
Filed July 25, 2008.

Michael E. Brunnabend, Public Defender, Allentown, for appellant.

James B. Martin, Assistant District Attorney, Allentown, for Commonwealth, appellee.

BEFORE: BOWES, ALLEN and KELLY, JJ.

OPINION BY BOWES, J.:

¶ 1 Joshua Michael Booze appeals from the September 11, 2006 judgment of sentence of twenty-three to forty-six years incarceration imposed after a jury found him guilty of two counts each of robbery and false imprisonment, and one count each of burglary, theft, and criminal conspiracy to commit robbery and burglary. After careful review, we affirm.

¶ 2 The record establishes the following. Sometime between 1:00 and 2:00 a.m. on November 9, 2002, Appellant and three cohorts broke into an apartment located at 925 Delaware Avenue in Fountain Hill, Pennsylvania. All four men were armed. Appellant, unlike the others, was not wearing a mask over his face. For approximately twenty minutes, the men held Lamarr Watson, Vanessa Mendez, and Vanessa's two-year-old daughter, Desiree, at gunpoint while they ransacked the apartment. They bound Watson's hands and feet with rope, put duct tape across his mouth, and kept him separated from Ms. Mendez and Desiree, who were restrained in another room. Appellant subsequently directed Ms. Mendez into the bathroom with Desiree where they remained until the perpetrators fled the apartment. N.T. Trial, 07/12/06, at 50–63.

¶ 3 The men stole various items including jewelry, clothing, cell phones, Play Stations, radios, and two handguns lawfully possessed by Mr. Watson. Id. at 61–62, 90. At one point, Appellant brazenly demanded that Ms. Mendez look at his face, concurrently admonishing and threatening to kill the victims if they reported the incident to the police. Id. at 124–25. After the robbery, Mr. Watson, Ms. Mendez, and Desiree fled to their families' homes. Mr. Watson reported the home invasion to police at approximately 9:30 a.m. that day. Id. at 66–67.

¶ 4 On November 27, 2002, Bridgewater Township Police Officer Paul Payne responded to a report of an automobile fire in Bridgewater, New Jersey. Officer Payne arrived on the scene and found a brown Nissan Maxima burning while Appellant stood nearby. Appellant claimed to have been a passenger in the vehicle and stated the driver had run away, but Appellant was unable to provide the driver's identity. N.T. Rule 600 and Suppression ("Pretrial Hearing"), 8/25/05, at 11. The police impounded the vehicle and retained possession for several months while they continued their investigation. Upon

acquiring a search warrant in March 2003, police found parts of a handgun in the car that were traced back to the Fountain Hill robbery. *Id.* at 17, 29–33.

¶ 5 Detective Christopher Burke of the Bridgewater Township Police Department then contacted Fountain Hill Police Investigator Wallace Fry. Detective Burke sent Officer Fry Appellant's picture, which the officer utilized in creating a photographic array. N.T. Trial, 7/12/06, at 155–56. On April 4, 2003, Fountain Hill Police showed Ms. Mendez the array, and she identified Appellant as the unmasked man in the November 2002 robbery. *Id.* at 136–37.

¶ 6 Bridgewater Police apprehended Appellant and his wife, Shante Knight, on April 5, 2003, on unrelated charges. At the police station, Appellant was given his *Miranda* rights. Appellant then signed a form indicating he understood each of his rights and put his initials on the form next to each individual statement. Appellant later made incriminating statements concerning his participation in the Fountain Hill robbery. *Id.* at 161–77, 181–86.

¶ 7 On April 8, 2003, the Fountain Hill Police filed a criminal complaint against Appellant for the Pennsylvania robbery. Lehigh County Detective Dennis Steckel contacted New Jersey Corrections Officer Petruche,[1] notified him that he had an open warrant for Appellant, and faxed a copy of the complaint and warrant "to the CO to file a detainer against [Appellant] in light of our open charge." N.T. Pretrial Hearing, 8/24/05, at 9. Detective Steckel confirmed that New Jersey filed the detainer.[2] *Id.* at 10. On June 2, 2003, Detective Steckel learned that Appellant had been sentenced on the Somerset County, New Jersey charges on May 19, 2003, to eighteen months imprisonment. *Id.* at 11. On July 21, 2003, New Jersey officials told Detective Steckel they would talk to Appellant to ascertain whether he was willing to voluntarily proceed under the Interstate Agreement on Detainers ("IAD").[3] *Id.* at 12. Detective Steckel testified that he still could not proceed under the IAD without Appellant's voluntary agreement because Appellant had other open charges pending against him in New Jersey; Appellant thus was unavailable for involuntary transfer pursuant to the IAD.[4] *Id.* at 14.

¶ 8 Detective Steckel explained the various forms and procedures under the IAD as follows:

1. Petruche's first name is not included in the certified record.

2. Unlike a request for extradition, which is a request that the state in which the prisoner is incarcerated transfer custody to the requesting state, a detainer is merely a means of informing the custodial jurisdiction that there are outstanding charges pending in another jurisdiction and a request to hold the prisoner for the requesting state or notify the requesting state of the prisoner's imminent release. *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 536 n. 5 (2006); *see also Commonwealth v. McNear*, 852 A.2d 401, 405 n. 3 (Pa.Super.2004) (quoting *Commonwealth v. Davis*, 567 Pa. 135, 786 A.2d 173, 175 (2001)).

3. The IAD is an agreement between forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States, that establishes procedures for the transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction which has lodged a detainer against a prisoner. *Commonwealth v. McNear*, 852 A.2d 401, 405 n. 3 (Pa.Super.2004) (quoting *Commonwealth v. Davis*, 567 Pa. 135, 786 A.2d 173, 175 (2001)).

4. The IAD applies only to persons serving sentences in other jurisdictions, not to those merely incarcerated while awaiting the disposition of criminal charges against them. *Commonwealth v. Hude*, 483 Pa. 489, 397 A.2d 772 (1979); *Commonwealth v. Heath*, 288 Pa.Super. 119, 431 A.2d 317 (1981).

There are a set of nine forms with the Interstate Agreement on Detainers. Forms one, two, three and four are filled out by the inmate at the facility that he is in, in whatever state we are trying to extradite him back from. And if he fills out forms one, two, three and four, that gives us information that he is either willing or not willing to do Interstate Agreement on Detainers.

Form five has to be done by the demanding state if in fact the person is not willing to sign and voluntarily do Interstate Agreement on Detainers.

Form[s] six and seven are used to actually set up a date and a time for pickup from the state that he is being incarcerated in. Form eight is another form that we would use to borrow or assume temporary custody from another agency in Pennsylvania if two of us were looking for the same individual at the same time.

And form nine is a form which we send back with the inmate to whatever state he is in, whatever prison in that state he is in, to let them know that he is finished with the charges in Pennsylvania and it also would accompany the—his sentencing sheet.

N.T. Pretrial Hearing, 8/24/05, at 13.

¶ 9 At that time, Appellant fluctuated between indicating his willingness to consent to the IAD procedures and denying his agreement. New Jersey officials communicated Appellant's back-and-forth positions to Detective Steckel. *Id.* at 15–18. On March 30, 2004, the detective received the IAD form signed by Appellant confirming his refusal to voluntarily comply with the IAD, but once again, an official in inmate records at New Jersey Northern State Prisons advised Detective Steckel that they were continuing to seek Appellant's cooperation. *Id.* at 18–19. When New Jersey authorities advised on June 16, 2004, that Appellant continued to refuse to cooperate, Detective Steckel began the **involuntary** transfer process. *Id.* at 19–20. That process required a *Cuyler* hearing[5] before a New Jersey judge, which was not held until March 2005.[6] Concerning this delay, Detective Steckel testified, "We're at the mercy of the prisons and also the court system in New Jersey as to when that is scheduled." *Id.* at 21. Appellant was brought to Pennsylvania on April 20, 2005.

¶ 10 On June 7, 2005, after the preliminary hearing and arraignment, Appellant filed a motion to dismiss pursuant to Pa. R.Crim.P. 600 followed by an omnibus pretrial motion on July 26, 2005, which included a motion to suppress Appellant's statement to police and evidence obtained during the vehicle search. A hearing was held on August 24 and 25, 2005, and in a memorandum issued December 28, 2005, the court suppressed the gun parts discovered during the car search. The court denied suppression of Ms. Mendez's identification, Appellant's statement to Bridgewater Township Police, and the motion to dismiss pursuant to Rule 600. Trial, originally scheduled for March 6, 2006, was continued due to the unavailability of both

---

5. In *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), the United States Supreme Court held that prisoners involuntarily transferred by detainer pursuant to the IAD were entitled to the same pre-transfer rights as those prisoners transferred under the Uniform Criminal Extradition Act, 42 Pa. C.S. § 9121 *et seq., i.e.,* a pretrial hearing. *See Commonwealth v. Gonce,* 320 Pa.Super. 19, 466 A.2d 1039 (1983).

6. The hearing initially was held on December 27, 2004, but consistent with Appellant's prior fluctuation between agreement to and refusal of voluntary transfer, Appellant waffled once again and stated he would now cooperate with his return to Pennsylvania. Thus, the New Jersey court continued the hearing while Appellant hired counsel. Following multiple continuances, the hearing was finally held in March 2005. *Id.* at 23–25, 466 A.2d 1039.

the prosecutor and the trial court. Pa. R.A.P.1925(a) Trial Court Opinion, 5/10/07, at 18.

¶ 11 On May 9, 2006, Appellant filed a motion to dismiss pursuant to 42 Pa.C.S. § 9101 for violation of the IAD, alleging the Commonwealth did not bring him to trial within 120 days of his return to Pennsylvania. This motion was denied after a hearing on May 17, 2006. Appellant subsequently filed motions *in limine* on July 10, 2006, to exclude Mr. Watson's cell phone that was found in the vehicle search, Ms. Mendez's identification of Appellant through the photo array, and Appellant's statement to police; he further sought to redact the recording and transcript of this statement. The Honorable William Ford suppressed the cell phone and allowed for redaction of the recording and transcript, but denied the motions in all other respects.

¶ 12 Appellant was tried on July 12 and 13, 2006, and was found guilty of two counts each of robbery and false imprisonment, and one count each of burglary, theft, and criminal conspiracy to commit robbery and burglary. He was sentenced on September 11, 2006, as described above. This appeal followed denial of his post-sentence motion on September 27, 2006.

¶ 13 Appellant now raises the following issues for our review:

A. Did the lower court err by failing to suppress from use at time of trial the Defendant's confession and an identification of the Defendant through the use of a photo array which were both the direct result of the improper seizure of other evidence by the police?

B. Were the Defendant's rights to a speedy trial pursuant to [Pa.R.A.P.] 600 violated due to the delay in his being returned from the State of New Jersey and then not being promptly given his trial?

C. Were the Defendant's rights to a speedy disposition of his case violated through the Commonwealth's failure to bring the Defendant to trial within 120 days after he was returned from New Jersey as required pursuant to the Interstate Agreement on Detainers Act?

D. Did the court abuse its sentencing discretion by giving the Defendant sentences for the robbery charges which exceeded the sentencing guideline ranges and for giving sentences that, for all charges and counts, were consecutive?

Appellant's brief at 10.

¶ 14 We first address Appellant's suppression issue. Appellant argues his statements to the Bridgewater Township Police and Ms. Mendez's photographic identification are "fruits of the poisonous tree" obtained through the illegal search and seizure of the vehicle impounded on November 27, 2002. Fountain Hill Police Officer Fry admitted at trial that Appellant was not a suspect in the Fountain Hill burglary prior to location of the gun parts through the vehicle search. Thus, Appellant claims his photographic identification and subsequent statement result directly from exploitation of the illegal search of the vehicle.

¶ 15 Our standard of review for the denial of suppression issues is well established.

The standard and scope of review for a challenge to the denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record

supports findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Graham,* 949 A.2d 939, 941–42 (Pa.Super.2008) (quoting *Commonwealth v. Hughes,* 575 Pa. 447, 836 A.2d 893, 898 (2003)).

¶ 16 At the suppression hearing on August 25, 2005, which addressed, *inter alia,* the legality of the original vehicle search by Bridgewater Township Police, the following facts were established. Shortly after impounding the car, police learned it belonged to Appellant's then-girlfriend, Shante Knight. In a telephone conversation with Detective Burke on November 28, 2002, Ms. Knight consented to a search of the vehicle and provided information about a problem with the catalytic converter that was later determined to be the likely cause of the fire. Later that day, Ms. Knight contacted the detective, withdrew her consent for the search, and requested that her car be returned. Despite Ms. Knight's repeated requests, police retained possession of the vehicle. On March 28, 2003, Detective Burke obtained a search warrant for the vehicle based upon information from a confidential informant. N.T. Pretrial Hearing, 8/25/05, at 46–52. The informant told police there were handguns in the vehicle, and he also claimed he was approached by someone who wanted to locate the impound lot to retrieve the items from the car. *Id.* at 56. During the search, police recovered parts of a handgun which they submitted for laboratory analysis. A ballistics expert was able to lift the serial number from the weapon, and it was traced to the Fountain Hill burglary because it had been owned by Mr. Watson. *Id.* at 33.

¶ 17 The suppression court determined police lacked probable cause to conclude the automobile was involved in criminal activity. The court ruled that the contin-

ued detention of the vehicle in light of Ms. Knight's requests for its return was improper. Thus, the court suppressed the gun parts found during the car's search, but declined to suppress Appellant's subsequent incriminating statement or Ms. Mendez's photographic identification of Appellant.

¶ 18 Appellant maintains that the Commonwealth failed to prove that the statement and photographic identification were not "fruit of the poisonous" tree. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Specifically, Appellant argues that his waiver of *Miranda* rights did not purge his incriminating statement of taint from the illegal search. Further, he contends that the trial court erred by using the voluntariness of the statement and the non-suggestive nature of the photographic array as reasons to admit the evidence. While the suppression court did rely on Appellant's knowing, voluntary, and intelligent *Miranda* waiver for admission of his incriminating statement, the admission of the array was exclusively based on Ms. Mendez's independent basis of knowledge and observation of Appellant during the burglary. Rule 600 and Suppression Court Opinion ("Pretrial Opinion"), 12/28/05, at 15.

¶ 19 Appellant's argument on these points is generalized and conclusory, as he merely asserts without particularization that application of the "*Wong Sun* line of cases," Appellant's brief at 24–25, requires the photographic identification and statement to be suppressed. He asserts that voluntariness is not relevant to breaking the causal chain between the initial illegality and his subsequent statement; he cites *Commonwealth v. Goodwin,* 561 Pa. 346, 750 A.2d 795 (2000), in support.

¶ 20 In *Goodwin,* police received an anonymous telephone tip that Constance Goodwin was a drug dealer who carried

approximately one-quarter pound of marijuana inside a pink bag. The caller also described her clothing, hair color, and automobile, and predicted that she would leave her office for a lunch beak around 12:15 p.m. Police then observed Goodwin, who matched the caller's description, leave the office around 12:10 p.m. carrying a pink bag. She entered her vehicle and drove several blocks before police stopped her and asked permission to search the car. Goodwin agreed and signed a consent form. Police then searched the pink bag which had been inside the automobile and found marijuana. Thereafter, police sought permission to search Goodwin's apartment. She consented to a search of the bedroom, and police discovered marijuana and drug paraphernalia. *Id.* at 349–50, 750 A.2d 795. The Pennsylvania Supreme Court reversed our decision affirming the judgment of sentence, holding that police, in relying completely on the anonymous tip, lacked reasonable suspicion to initiate the original investigatory stop. Goodwin's consent to search her vehicle and subsequent incriminating statements were suppressed as fruits of an illegal stop. *Id.* at 361, 750 A.2d 795.

¶ 21 *Goodwin* is inapposite to the instant case. The excluded statements in *Goodwin* were given after an illegal stop that lacked a reasonable suspicion of criminal activity, followed by an illegal search that exceeded the scope of consent. Herein, however, Appellant's statement was given after a valid arrest on charges unrelated to the Fountain Hill burglary. Further, Appellant's "own free will in confessing [purged] evidence of any taint deriving from an illegal search." *Commonwealth v. Rood,* 686 A.2d 442, 448 (Pa.Cmwlth.1996). Appellant's statement was not coerced and was given subsequent to a valid arrest after a knowing, voluntary, and intelligent waiver of his *Miranda* rights. The trial court correctly ruled to admit it as evidence.

¶ 22 Similarly, the photographic identification, which occurred at the Fountain Hill Police Department on April 4, 2003, had an independent basis apart from the vehicle search because Ms. Mendez observed Appellant during the commission of the burglary, wherein Appellant actually challenged her to observe his face. N.T. Pretrial Hearing, 8/25/05, at 6. Officer Fry showed Ms. Mendez six photographs, including a picture of Appellant. Ms. Mendez testified at trial that she was instructed to look at all of the photographs carefully and was given no directions or suggestions to focus on any particular one. N.T. Trial, 7/12/06, at 135–37. Indeed, Appellant concedes the legality of the composition and presentation of the array. Appellant's brief at 21. Upon choosing Appellant's photograph, Ms. Mendez stated she was "very sure" that Appellant was the unmasked man from the robbery. N.T. Trial, 7/12/06, at 137. When she was shown the array again in court, she testified that she remained "really sure." *Id.* at 138. She then made an in-court identification of Appellant, stating, "I'm a hundred percent sure he's the one that was in the robbery, he was the leader." *Id.* at 140.

¶ 23 This independent basis for identification provides sufficient attenuation from the illegal search of the vehicle. Thus, the prior "illegality contributed neither to the knowledge of the [witness] nor to the accuracy of [her] dentification." *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33, 38 (1972). This court has ruled that a "defendant's face cannot be a suppressible fruit of an illegal arrest," and it follows that Appellant's face cannot be the suppressible fruit of an illegal search when Ms. Mendez is comparing "her own mental image of the perpetrator, with the individual" shown in the array. *Commonwealth v. Howard,* 442 Pa.Super. 337, 659 A.2d 1018, 1023 (1995).

■ ¶ 24 Moreover, the photographic identification also falls under the inevitable discovery rule because the Bridgewater Township Police inevitably would have contacted the Fountain Hill Police once Appellant gave his incriminating statement upon his valid arrest, and that, in turn, would have led to his inevitable identification by Ms. Mendez. "In such situations, there is no significant causal connection between the acquisition of the evidence and the unlawful police conduct, and evidence so obtained is not considered to be tainted by, or to be the fruit of, an illegal search." *Rood*, 686 A.2d at 448. We reject Appellant's contention.

■ ¶ 25 We now address Appellant's issue that the Commonwealth violated his rights to a speedy trial under Pa.R.Crim.P. 600 "due to the delay in [Appellant's] being returned ... to Pennsylvania." Appellant's brief at 10. This issue is somewhat intertwined with Appellant's claim that the Commonwealth also violated the IAD. Certainly, the analysis of Appellant's Rule 600 issue necessitates reference to the IAD. The criminal complaint was filed on April 8, 2003; trial on these charges began on July 11, 2006. Appellant asserts that the Commonwealth's delay in failing to begin the formal involuntary IAD transfer process for over one year, or until July 29, 2004, and the Commonwealth's subsequent failure to expedite this process, constitutes a lack of due diligence under Rule 600.

¶ 26 Pa.R.Crim.P. 600 provides, in relevant part:

### Rule 600. Prompt Trial

. . . .

[ (A) ](2) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is incarcerated on that case, shall commence no later than 180 days from the date on which the complaint is filed.

. . . .

(B) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

(C) In determining the period for commencement of trial, there shall be excluded therefrom:

(1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;

(2) any period of time for which the defendant expressly waives Rule 600;

(3) such period of delay at any stage of the proceedings as results from:

(a) the unavailability of the defendant or the defendant's attorney;

(b) any continuance granted at the request of the defendant or the defendant's attorney.

. . . .

If the court, upon hearing, shall determine that the Commonwealth exercised due diligence and that the circumstances occasioning the postponement were beyond the control of the Commonwealth, the motion to dismiss shall be denied and the case shall be listed for trial on a date certain. If, on any successive listing of the case, the Commonwealth is not prepared to proceed to trial on the date fixed, the court shall determine whether the Commonwealth exercised due diligence in attempting to be prepared to proceed to trial. If, at any time, it is determined that the Commonwealth did not exercise due diligence, the court shall dismiss the charges and discharge the defendant. . . .

The comment to the rule provides, in pertinent part:

. . . .

For periods of delay that result from the filing and litigation of omnibus pretrial motions for relief or other motions, *see Commonwealth v. Hill,* [558 Pa. 238, 736 A.2d 578 (1999) ] . . . .

Under paragraph (C)(3)(a), in addition to any other circumstances precluding the availability of the defendant or the defendant's attorney, **the defendant should be deemed unavailable for the period of time during which the defendant contested extradition, or a responding jurisdiction delayed or refused to grant extradition**. . . .

(emphasis added).

¶ 27 We review application of Rule 600 with regard to the following principles:

In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right

to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters . . ., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Ramos,* 936 A.2d 1097, 1100 (Pa.Super.2007) (*en banc*) (quoting *Commonwealth v. Hunt,* 858 A.2d 1234, 1238–39 (Pa.Super.2004) (*en banc*)).

¶ 28 Under Rule 600, there is a distinction between excludable time and excusable delay:

"Excludable time" is defined in Rule 600(C) as the period of time between the filing of the written complaint and the defendant's arrest, . . . any period of time for which the defendant expressly waives Rule 600; and/or such period of delay at any stage of the proceedings as results from: (a) the unavailability of the defendant or the defendant's attorney; (b) any continuance granted at the request of the defendant or the defendant's attorney. "Excusable delay" is not expressly defined in Rule 600, but the legal construct takes into account delays which occur as a result of circumstances be-

yond the Commonwealth's control and despite its due diligence.

*Brown, supra* [875 A.2d 1128] at 1135 (quoting *Hunt, supra* at 1241).

*Commonwealth v. Jones,* 886 A.2d 689, 700 (Pa.Super.2005).

¶ 29 Our Supreme Court has stated that in order to establish that a delay occasioned by the filing of a defense motion is excludable, the Commonwealth must show that it exercised due diligence in opposing the pretrial motion. *Commonwealth v. Hill, supra; see also Commonwealth v. Wallace,* 804 A.2d 675 (Pa.Super.2002). Moreover,

> a criminal defendant who is incarcerated in another jurisdiction is unavailable within the meaning of Rule 600 if the Commonwealth demonstrates by a preponderance of the evidence that it exercised due diligence in attempting to procure the defendant's return for trial. *Commonwealth v. Hill, [supra].* "Due-diligence is a fact-specific concept that is determined on a case-by-case basis." *Wallace, supra* at 680. "Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." *Hill, supra* at 588.

*Commonwealth v. McNear,* 852 A.2d 401, 404 (Pa.Super.2004).

¶ 30 Appellant concedes that the timeline set forth in both the pretrial opinion of the Honorable John P. Lavelle and the Pa.R.A.P.1925(a) opinion of the Honorable William E. Ford is accurate. *See* Appellant's brief at 25. He asserts, however, that the interpretation and treatment of the occurrences listed therein were erroneous.

¶ 31 The record herein amply demonstrates that Detective Steckel exercised due diligence in his efforts to effect the transfer of Appellant to Pennsylvania in a timely fashion. Between April 2003 and May 2004, Appellant was transferred among various New Jersey prisons no fewer than five times. Our review of the record reveals that Detective Steckel remained in contact with the appropriate New Jersey authorities throughout this period. N.T. Pretrial Hearing, 8/24/05, at 9–19. He made approximately thirty separate telephone calls to encourage various New Jersey officials to resolve Appellant's status. *Id.* at 22. It was actually the New Jersey authorities who expressed opposition to the lengthy involuntary IAD process. *Id.* at 18–19. New Jersey officials repeatedly assured Detective Steckel that Appellant was willing to transfer to Pennsylvania voluntarily pursuant to Article III of the IAD. *Id.* at 14, 17. It was not until March 30, 2004, that Detective Steckel received information that Appellant was allegedly unwilling to undergo voluntary transfer. *Id.* at 18. Nevertheless, New Jersey officials still opposed the involuntary IAD procedure and pled that more time was needed to acquire Appellant's cooperation. Detective Steckel ultimately became convinced of Appellant's bad faith; thus, he forwarded a completed IAD Form V to New Jersey officials on July 29, 2004, to initiate Appellant's involuntary transfer. New Jersey did not hold the appropriate extradition hearing until March 22, 2005. Upon completion of required administrative procedures, Appellant was then transferred to Pennsylvania custody on April 20, 2005.

¶ 32 Due to the unavailability of the Commonwealth's witnesses, the preliminary hearing was not held until May 31, 2005. Pretrial Opinion, 12/28/05, at 10. Appellant filed his motion to dismiss pursuant to Rule 600 on June 7, 2005, and the omnibus pretrial suppression motion on July 26, 2005. The Rule 600 and omnibus pretrial motions were heard before Judge Lavelle on August 24 and 25, 2005. Judge Lavelle ruled on the motions, denying the

Rule 600 motion on December 28, 2005. Due to both the trial court's and the prosecutor's unavailability, the trial was continued until July 11, 2006. Pa.R.A.P.1925(a) Trial Court Opinion, 5/10/07, at 18.

¶ 33 We are compelled to examine applicability of *Commonwealth v. Booze,*[7] 947 A.2d 1287 (Pa.Super.2008), wherein this Court recently affirmed a trial court's dismissal of charges for a Rule 600 violation in a case involving an incarcerated defendant in Maryland. We conclude that *Booze* is distinguishable from the instant case.

¶ 34 In *Booze,* the Commonwealth became aware that the defendant was being held in Maryland as of February 1, 2006. This Court ruled that the Commonwealth failed to show due diligence in bringing Ms. Booze to trial in a timely manner despite having filed a criminal complaint against her on February 6, 2006. Apart from faxing a copy of the complaint to Maryland authorities, which allegedly was intended to serve as a detainer, the Commonwealth made no other efforts to take the defendant into custody prior to her filing a motion to dismiss on April 3, 2007. In reiterating that *Booze* did not "vitiate previous case law that allows excludable or excusable time to the Commonwealth upon a showing of due diligence," *id.* at 1293, we noted that there was nothing whatsoever in the record in support of the Commonwealth's exercise of due diligence other than the faxed complaint to Maryland authorities. The extent of the Herculean effort by Detective Steckel to acquire custody of Appellant in the instant case stands in stark contrast to the situation in *Booze.*

¶ 35 As noted, the trial court herein found and the record supports the Commonwealth's exercise of due diligence in bringing Appellant to trial in Pennsylvania within the parameters of Rule 600. The mechanical run date, one year following the filing of the criminal complaint, was April 8, 2004. *Id.* (mechanical run date for purposes of Rule 600 is 365 days after filing of complaint). New Jersey officials told Detective Steckel when the complaint was filed that Appellant was incarcerated in Somerset County, New Jersey, he was being prosecuted on New Jersey criminal charges, and they would notify the detective when Appellant became available. New Jersey's opposition to involuntary transfer also was made clear to Detective Steckel. New Jersey prison officials notified Detective Steckel on June 4, 2003, that Appellant agreed to sign the IAD forms, thereby eliminating the necessity of "Form V" involuntary IAD proceedings. In reliance upon this representation, Detective Steckel therefore forwarded the IAD waiver forms to New Jersey.

¶ 36 The trial court ruled that Appellant then "embarked on a prolonged and devious cat and mouse game with Steckel in which [Appellant] would agree to sign the forms and then make up some excuse for not signing them." Pretrial Opinion, 12/28/05, at 18. The court determined that Appellant pursued this tactic for twelve months and twelve days, until June 16, 2004. At that point, Detective Steckel finally concluded that Appellant's willingness to comply with the IAD was a sham, when Appellant finally confirmed that he would not agree to comply with the IAD procedure. Thus, the trial court concluded, and we agree, that these 377 days should be excluded.

¶ 37 Detective Steckel's initiation of the involuntary IAD procedures thus occurred on July 29, 2004, when he sent Form V to

---

7. The defendant in that case, a female, coincidentally bears the same surname as Appellant herein.

New Jersey. New Jersey delayed the process, as noted *supra*, until March 27, 2005, when a New Jersey judge finally ordered that Appellant be transferred to Pennsylvania. Fountain Hill Detective Fry and Lehigh County Detective Oswald brought Appellant from New Jersey on April 20, 2005. N.T. Pretrial Hearing, 8/24/05, at 27–28. Thus, the 256 days between July 29, 2004, and April 20, 2005, also was properly excluded from the Rule 600 calculation by the trial court.

¶ 38 There clearly is no merit to Appellant's claim that the trial court's finding of due diligence is not supported by the record. In the face of New Jersey's opposition to Appellant's transfer to Pennsylvania through the IAD involuntary procedure, Detective Steckel maintained continuous telephone contact with New Jersey prison authorities from April 8, 2003, until March 29, 2005, as they moved Appellant to five different New Jersey prisons. As noted by the trial court, Detective Steckel "closely monitored the prosecution of the [New Jersey] charges, defendant's guilty plea, his sentence to an 18 month prison term on May 19, 2003, and his movements to various prison sites in New Jersey." Pretrial Opinion, 12/28/05, at 20. This record adequately demonstrates that the Commonwealth pursued Appellant's transfer to Pennsylvania with persistence, despite a lack of cooperation from New Jersey officials and Appellant's duplicitous conduct.

¶ 39 This case is remarkably similar to *Commonwealth v. Jones, supra*. In determining that the trial court therein properly concluded that the Commonwealth acted with due diligence in effecting the defendant's transfer from New York to Pennsylvania, where the detective "maintained almost constant contact with New York authorities," *id.* at 703, we noted, "The Commonwealth is not required to demonstrate that it acted with perfect diligence and punctilious care, but only that it acted with due diligence, *i.e.*, that it made reasonable efforts to proceed with trial." *Id.* at 703–04.

¶ 40 In light of our standard of review, we conclude the record supports the trial court's conclusion that the Commonwealth demonstrated due diligence by showing it put forth "a reasonable effort," which is all that is required. *Hill, supra* at 588. Thus, we reject Appellant's claim pursuant to Rule 600.

¶ 41 We now address Appellant's argument that his rights pursuant to the IAD were violated. As noted *supra*, Appellant filed a motion to dismiss on May 9, 2006, pursuant to 42 Pa.C.S. § 9101 for violation of the IAD, alleging the Commonwealth did not bring him to trial within 120 days of his return to Pennsylvania. This motion was denied after a hearing on May 17, 2006. Appellant maintains that he was required to be brought to trial within 120 days of April 20, 2005, his return to Pennsylvania, and this period expired before the original trial date of March 6, 2006. Additionally, he argues that the trial court erred in excluding the period from June 7, 2005, the date Appellant filed his motion to dismiss pursuant to Pa.R.Crim.P. 600 until July 12, 2005, his arraignment date. Finally, he claims that if we determine that the 120 days did not expire by March 6, 2006, the Commonwealth's motion to continue the trial to July 10, 2006, was granted without a showing that the continuance was reasonable or necessary.

¶ 42 Appellant concedes that since he contested transfer to Pennsylvania, Article IV of the IAD applies. Appellant's brief at 30. Article IV sets forth the procedure whereby authorities in the requesting state initiate transfer of an accused who is incarcerated in another jurisdiction.

(a) The appropriate officer of the jurisdiction in which an untried indict-

ment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated....

....

(c) In respect of any proceeding made possible by this article, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, **the court having jurisdiction of the matter may grant any necessary or reasonable continuance.**

42 Pa.C.S. § 9101, Article IV (emphasis added).

¶ 43 We interpreted the applicability of Article IV in *Commonwealth v. Jones, supra* at 696:

"[T]he IAD may be tolled by the defendant's own actions." *Commonwealth v. Montione*, 554 Pa. 121, 720 A.2d 738, 741 (1998), *cert. denied*, 526 U.S. 1098, 119 S.Ct. 1575, 143 L.Ed.2d 671 (1999).[FN4] Article VI(a) of the IAD also addresses periods of delay which do not count toward the 120–day calculation:

4. In *Montione*, our Supreme Court looked favorably upon this Court's analysis of the IAD's timeliness provisions in *Commonwealth v. Woods*, 444 Pa.Super. 321, 663 A.2d 803 (1995):

Although this court has not previously addressed tolling requirements in relation to the IAD, we find persuasive the analysis and interpretation of the courts that held that delay occasioned by the defendant is excludable, particularly in light of recent application of speedy trial provisions to IAD cases by Pennsylvania courts. *See e.g.*

*Woods, supra* (applying speedy trial provisions to the IAD in holding that defendant's continued presence in federal custody constitutes an inability to stand trial, thereby tolling the statute). The *Woods* court determined that the IAD is consistent with the speedy trial provisions of Rule 600. *Montione, supra* at 126, 720 A.2d at 741 (some internal citations omitted).

In determining the duration and expiration dates of the time periods provided in Article III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

42 Pa.C.S.A. § 9101, Article VI(a).

¶ 44 The trial court included the period from April 20, 2005, until June 7, 2005, the date Appellant filed his Rule 600 motion, in the 120–day calculation. The trial court determined that Appellant's filing of his Rule 600 motion on June 7, 2005, caused a delay in trial, as the "motion had to be heard. For the sake of judicial economy, it was ultimately scheduled for August 24, 2005, for hearing so that it could be heard on the same day as the defense omnibus pretrial motions." *Id.* at 22. The motions were decided December 28, 2005. Appellant would have the trial court include the time between the filing of the Rule 600 motion on June 7, 2005, until July 12, 2005, when Appellant "did in fact request a pretrial hearing date."

¶ 45 Appellant contends that the trial court erred in applying *Commonwealth v. Hyland*, 875 A.2d 1175 (Pa.Super.2005). He maintains that the case stands for the proposition that the mere filing of a pretrial motion does not render a defendant unavailable for trial for purposes of Rule 600 and the IAD.

¶ 46 We note initially that *Hyland* exclusively involved Rule 600; there was no application or interpretation of the IAD. Moreover, the learned trial court herein explained that while decisions of this Commonwealth have applied speedy trial cases when deciding those involving the IAD, "the worthy goals promoted by Rule 600 and the IAD converge in some respects but are distinct in other respects." Pa. R.A.P.1925(a) Trial Court Opinion, 5/10/07, at 21. Further, while the *Hyland* Court did indeed note that the mere filing of a pretrial motion does not render a defendant unavailable for trial **for purposes of Rule 600,** it does not stand for the proposition asserted by Appellant.

¶ 47 In *Hyland,* the defendant conceded that the time between the filing of his omnibus pretrial motion, April 10, 2003, and the court's denial of that motion on May 30, 2003, was excludable time for purposes of the speedy trial rule. This Court, in reviewing the defendant's Rule 600 claim, concluded that "the relevant excludable period attributable to Appellant's omnibus pretrial motion" actually began when the defendant asked on February 25, 2003, for a hearing on the omnibus pretrial motion that was not yet filed. *Id.* at 1191. Thus, our ruling *expanded* the excludable time to include the period from when the defendant first advised the court that he intended to file the motion to its eventual disposition. Contrary to Appellant's assertion in his brief, *Hyland* actually supports the trial court's decision in the instant case that the relevant excludable period began with the filing of the June 7, 2006 motion, which was the date the trial court was first apprised of the motion.

¶ 48 We therefore agree with the trial court's calculation that the period beginning April 20, 2005, through June 7, 2005,

forty-eight days, is includable in the 120–day period. The period between the filing of the Rule 600 motion on June 7, 2005, and the disposition of the Rule 600 motion and the omnibus pretrial motions on December 28, 2005, is excludable from the 120–day period. Counting from December 28, 2005, until March 7, 2006,[8] the date the trial court continued the trial, is sixty-nine days. Thus, the two includable periods, forty-eight days and sixty-nine days, total 117 days, well within the 120–day period.

¶ 49 Appellant's alternative argument is that the trial court erred in continuing the trial from March 6, 2006, due to the prosecutor's unavailability. He cites no case law in support, and merely contends in conclusory fashion that the continuance was neither reasonable nor necessary. The trial court rejected this contention and supported its reasoning as follows:

I granted the March 7 continuance because good cause was shown. The assistant district attorney, who had handled this case from its inception in Pennsylvania, was trying ... [a] homicide trial which did not conclude until March 23, 2006.

. . . .

Because the continuance was granted for good cause shown, the 120 day calculation was tolled as of March 7, 2006. The actual commencement of trial on July 11, 2006, had nothing to do with the action or inaction of the Commonwealth. I scheduled the trial for two dates in June but because of my need for research on the outstanding IAD motion which was heard May 17, 2006, and because of previously scheduled trials, the week of July 10, 2006, was the first realistic week for the trial of this case so I cancelled the two June trial dates.

---

8. The original trial date was March 6, 2006. The Commonwealth sought a continuance on March 2, 2006, which the trial court granted on March 7, 2006. The five days between March 2 and March 7, 2006, were not excluded from the 120–day period.

The one day delay of the trial from July 10 until July 11, 2006, was necessary to decide the defense motions *in limine* which were filed on July 10, 2006. Accordingly, the time period between the granting of the continuance on March 7, 2006, and the beginning of trial on July 11, 2006, was properly excluded from the IAD 120 day calculation.

Pa.R.A.P.1925(a) Trial Court Opinion, 5/10/07, at 24–25. The trial court's grant of the continuance was reasonable and necessary. *See* 42 Pa.C.S. § 9101, Art. IV(c).

¶ 50 We conclude, as did the Court in *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 537 (Pa.2006), that the trial court's assessment of the 120–day IAD period "is supported by the record, and appellant's attempt at dismissal was properly rejected."

■ ¶ 51 Finally, we address Appellant's claim that his sentence is excessive. The right to appeal the discretionary aspects of a sentence is not absolute. In accordance with Pa.R.A.P. 2119(f) and *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987), Appellant has included in his brief a concise statement of reasons relied upon for this appeal. Therefore, we must determine whether he has raised a substantial question regarding the appropriateness of his sentence. *Commonwealth v. Bailey*, 818 A.2d 543 (Pa.Super.2003); *see also* 42 Pa.C.S. § 9781(b).

¶ 52 Appellant's two-sentence Rule 2119(f) statement asserts in the most conclusory fashion that his sentence was excessive, the sentences for the robbery counts exceeded the guideline ranges, and the court's reasons for the sentences imposed merit our review. Appellant is incorrect that the sentences imposed for robbery exceeded the guideline ranges. In actuality, those sentences, unlike the standard-range sentences on the other counts, were in the aggravated range of the guidelines; they were not beyond the guideline ranges. Thus, the only aspect of the Rule 2119 statement that can raise a substantial question is the allegation or rather, inference, that the trial court's reasons for the sentences imposed are somehow insufficient. We will assume that this is an allegation that the court failed to state adequate reasons on the record for imposing an aggravated-range sentence, and as such, it raises a substantial question for our review. *See Commonwealth v. Fullin*, 892 A.2d 843 (Pa.Super.2006). *See also Commonwealth v. Bromley*, 862 A.2d 598 (Pa.Super.2004) (defendant did not raise substantial question by merely asserting sentence was excessive when he failed to reference any section of Sentencing Code potentially violated by sentence); *Commonwealth v. Trippett*, 932 A.2d 188 (Pa.Super.2007) (bald allegation of excessiveness does not raise a substantial question).

■ ¶ 53 Our standard of review is settled:

> This Court may only reach the merits of an appeal challenging the discretionary aspects of sentence "where it appears that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code." A substantial question will be found where the defendant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the code or is contrary to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Eby*, 784 A.2d 204, 205–06 (Pa.Super.2001) (citations omitted).

If an appellant raises a substantial question as to the appropriateness of a sentence, our scope of review has been defined as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing

judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Rodda,* 723 A.2d 212 (Pa.Super.1999) (citations omitted).

*Commonwealth v. Zurburg,* 937 A.2d 1131, 1135 (Pa.Super.2007).

¶ 54 Like his cursory Pa.R.A.P. 2119 statement, Appellant's substantive argument intimates in four sentences that the trial court's inadequate reasons for the sentence imposed are akin to failing to place on the record any reasons for the sentences imposed "in light of the fact that the sentencing court gave [Appellant] consecutive sentences on all cases and counts." Appellant's brief at 33.[9] Although Appellant declined to develop his claim and support it with any citation to case law, we will not consider it waived. *See Commonwealth v. McNear, supra* (mere mention of issue without citation to relevant authority and development of issue results in waiver); *Commonwealth v. Franklin,* 823 A.2d 906 (Pa.Super.2003).

¶ 55 We note that a sentencing court has discretion to impose consecutive sentences. 42 Pa.C.S. § 9721; *Commonwealth v. Pass,* 914 A.2d 442, 446–47 (Pa.Super.2006) ("42 Pa.C.S. section 9721 affords the sentencing court discretion to impose its sentence concurrently or consecutively.... Any challenge to the exercise of this discretion ordinarily does not raise a substantial question."). Moreover, to the extent

Appellant suggests the court failed to "balance any mitigating and aggravating factors," Appellant's brief at 33, the issue is meritless. *See Commonwealth v. Lewis,* 911 A.2d 558 (Pa.Super.2006) (position that court did not consider or did not give adequate weight to mitigating factors does not raise a substantial question permitting appellate review). We conclude the sentences were thoroughly supported by the record, as indicated by the trial court as follows:

> The defendant is inaccurate in his contention that I did not state adequate reasons on the record for imposing aggravated range sentences on the two robbery counts. The reasons for my giving these minimum sentences were set forth in detail at the sentencing hearing. They are found at pages 16 through 19 of the transcript of the sentencing hearing.
>
> In explaining the reasons for these sentences, I first made note of the presentence investigation report. I indicated, "it would be very difficult to find a more disturbing presentence report than this." N.T., 9/11/06, p. 16. In the presentence report, the defendant contended that the police set him up and they threatened his pregnant wife. He then said, "When I get out, them mother f**s are going to pay for all the time I did." The probation officer asked the defendant to elaborate. He stated, "I didn't mean nothing." N.T., 9/11/06, p. 17.
>
> The probation officer asked the defendant his plans after release from prison. The defendant stated, "I'm not going to need a GED for what I'm going to do." He also talked about "payback, give back to the community," but he declined

---

**9.** This statement is inaccurate as the record reveals that the sentence for theft by unlawful taking was made concurrent to the sentence for burglary at count two.

further comment about that. N.T., 9/11/06, p. 17.

While the defendant was incarcerated in New Jersey after the present charges were filed, he had two institutional misconducts. In Lehigh County Prison, he had ten misconducts and these included an aggravated assault by a prisoner and possession of contraband. N.T., 9/11/06, p. 17.

When the probation officer asked defendant about cocaine use, he replied, "That's my money getter. It maybe got in my system when I was cutting it up." Defendant indicated that he supported his drug habit by selling drugs. He stated that he had ten individuals selling drugs for him and he made about $5,000 weekly from the sales. In talking about the individuals who sold drugs for him, the defendant told the probation officer, "Them mother f* *s owe me and when I get out I ain't going to have no trouble getting what's owed me." N.T., 9/11/06, pp. 17–18.

The defendant was asked how he plans to pay his existing court related costs. His response was, "I'm not paying these mother f* *s shit, write that down." N.T., 9/11/06, p. 18.

The defendant expressed an interest in martial arts and explained his motivation for that. "The first person that disrespects me I knock them the fuck out. That's why I stick to myself." As to present use of martial arts, he stated, "You can't do much in here in prison with these f* * *ing faggot ass police." N.T., 9/11/06, p. 18.

After the commission of this home invasion robbery in Fountain Hill, the defendant committed other criminal offenses in New Jersey which offenses were not factored into the guidelines.

I then referred on the record to the facts of this case. I noted that this was a home invasion robbery. The male in the apartment, Lamarr Watson, was duct taped and bound with rope. All four robbers used guns. The ringleader of the four was the defendant. He gave the orders and the other three followed those orders. N.T., 9/11/06, pp. 18–19. In imposing the sentences, I noted that the defendant was an extremely dangerous individual and the community needed to be protected from him. I stated, "And I deviate from the standard range on the two (robbery) guidelines, I sentence in the aggravated range for the reasons that were just stated." N.T., 9/11/06, p. 19.

I noted as reasons for the sentences, punishment of the defendant, deterrence of other would-be robbers and protection of the community.

I also completed the "Reasons for Sentence" section on the sentencing guideline forms for the robberies. I wrote as the reasons for the aggravated range sentences: "Stated on the record but reasons include: lack of remorse; threatening comments (about others) to probation officer; prison misconducts; facts of crimes; commission of crimes after these crimes; defendant is a danger to the community."

Pa.R.A.P.1925(a) Trial Court Opinion, 5/10/07, at 28–30.

¶ 56 Clearly, the court made an ample record of the reasons for the sentences imposed; thus Appellant's sentencing issue lacks merit. *Commonwealth v. Gooding*, 818 A.2d 546 (Pa.Super.2003) (trial court satisfied duty to make record of reasons for sentence imposed). The court did not apply the guidelines erroneously, nor was their application unreasonable; moreover, the court did not impose an unreasonable sentence that is outside the guidelines. Therefore, the sentence will be affirmed. 42 Pa.C.S. § 9781(c) and (d); *See Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d

957 (2007) (appellate review of discretionary aspects of sentence confined by statutory mandate of 42 Pa.C.S. § 9781(c) and (d)).

¶ 57 Judgment of sentence affirmed.