**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Jose GONZALEZ, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 20, 2009.

Filed July 17, 2009.

Timothy T. Engler, Lebanon, for appellant.

Nichole L. Eisenhart,. Assistant District Attorney, Lebanon, for Commonwealth, appellee.

BEFORE: BOWES, SHOGAN and KELLY, JJ.

OPINION BY BOWES, J.:

¶ 1 Appellant, Jose Gonzalez, appeals from the judgment of sentence of three to six years incarceration imposed on March 19, 2008, following his conviction at a bench trial of possession of cocaine, possession of heroin, possession of cocaine with intent to deliver, and possession of drug paraphernalia. We affirm.

¶ 2 The trial court aptly summarized the facts of the case as follows:

On April 12, 2007, [Lebanon City Police] Officer Brett Fisher traveled to an apartment building at 221 North Eighth Street. He was looking for Ismael Oquendo, who was reported to be a tenant of Room 14. Officer Fisher knocked on Room 14, but no one answered.

While Officer Fisher was standing in the hallway adjacent to Room 14, the door to Room 15 opened. The Defendant, Jose Gonzalez, appeared at the doorway. Officer Fisher engaged the Defendant in conversation about the whereabouts of Mr. Oquendo. During this conversation, Officer Fisher saw a sandwich bag with a "twisted" end on the bed within the Defendant's room. Based upon his experience, Officer Fisher was aware that sandwich bags twisted in such a manner often contained controlled substances.

Officer Fisher asked the Defendant: "Do you mind if we come in? We want to talk with you about your neighbor." The Defendant responded "sure". At this point, Officer Fisher and his partner entered the Defendant's apartment and spoke with the Defendant in a calm and non-threatening tone of voice.

During his conversation with the Defendant, Officer Fisher asked if the Defendant had drugs and cash. The Defendant responded that he did. Almost immediately, and without any prompting on the part of Officer Fisher, the Defendant pulled a wad of cash and crack cocaine out of his pockets and presented the items to Officer Fisher. Officer Fisher asked the Defendant if he had anything else. The Defendant volunteered that there were more drugs inside the dresser. Once again, the Defendant voluntarily retrieved and presented additional drugs to Officer Fisher. He then went into a closet and retrieved yet another bag of cocaine in order to present that bag to Officer Fisher.

At no time during this encounter did either Officer Fisher or his partner display their handguns or any other weapon. At no time did Officer Fisher or his partner place their hands on the Defendant or physically restrain him in any way. At no time did Officer Fisher or his partner threaten the Defendant or interrogate him in an accusatory manner. In fact, Officer Fisher utilized a calm and conversational tone of voice throughout the encounter.

Suppression Court Opinion, 10/24/07, at 2–3.

¶ 3 Appellant filed a pretrial motion to suppress on August 16, 2007, which the trial court denied following a hearing on August 30, 2007. Appellant proceeded to a bench trial and was convicted of the aforementioned offenses on January 28, 2008. On March 19, 2008, the trial court imposed a sentence of three to six years imprisonment. This appeal followed, wherein Appellant argues that the trial court erred in denying his pretrial suppression motion.

¶ 4 When presented with a challenge to the denial of a motion to suppress evidence, we are limited to determining whether the trial court's factual findings are supported by the record and whether the legal conclusions drawn from those findings are correct. *See Commonwealth v. Williams,* 941 A.2d 14 (Pa.Super.2008) (*en banc*). In conducting our review, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Graham,* 949 A.2d 939, 941–42 (Pa.Super.2008), *appeal granted on other grounds,* 963 A.2d 901 (Pa.2008). If the trial court's factual findings are supported by the record, we are bound by those facts; however, we may reverse the suppression court when it draws erroneous legal conclusions from those factual findings. *Commonwealth v. Booze,* 953 A.2d 1263 (Pa.Super.2008); *In re V.H.,* 788 A.2d 976 (Pa.Super.2001).

¶ 5 At the suppression hearing in this case, the only evidence presented was that of Officer Fisher, who testified for the Commonwealth. As Officer Fisher's testimony was uncontradicted, no relevant facts are in dispute. To the extent the issue presented is purely a question of law, our standard of review is *de novo. Commonwealth v. Worthy,* 598 Pa. 470, 957 A.2d 720 (2008) (citing *Commonwealth v. Beaman,* 583 Pa. 636, 880 A.2d 578 (2005)).

¶ 6 In the instant case, Appellant contends that the drugs and drug paraphernalia found in his room and his statements to police should have been suppressed because Appellant "was pressured, or otherwise coerced, into consenting to a search of his room and his person." Appellant's brief at 9, 18. He avers that police entered his room illegally, maintaining that he was subjected to a custodial interrogation or investigative detention without reasonable suspicion and without *Miranda*[1] warnings.

¶ 7 The trial court rejected this claim and concluded that the entire interaction between Appellant and Officer Fisher was a mere encounter. The uncontradicted testimony of Officer Fisher established that on April 12, 2007, Officer Fisher and his partner, Lebanon City Police Officer Cory Gebhard, both of whom were in full uniform displaying their badges, knocked on the door of room 14 at 221 North 8th Street during a follow-up investigation of Ismael Oquendo. N.T., 8/30/07, at 4–6. Appellant, the occupant of adjacent room 15, opened his door and stood there while his guest exited and walked down the hall. *Id.* As Appellant stood in the open doorway, Officer Fisher could see ninety percent of the room and observed a "plastic sandwich bag that was twisted ... in a long manner and then it was like in a squiggly." *Id.* at 7. Officer Fisher engaged Appellant in conversation about Mr. Oquendo, ultimately asking Appellant if the officers could "step inside the room because I didn't really want to talk about the person in Room 14 out in the hallway." *Id.* at 8. Appellant "said we could." *Id.* Both officers entered Appellant's room; Officer Fisher stood inside the room, and Officer Gebhard stood behind him. *Id.* at 8, 18, 26. Officer Fisher described Officer Gebhard's position as "standing in the open doorway just like right inside the threshold." *Id.* at 10.[2]

¶ 8 When Officer Fisher stepped inside the room, he could see the portion of the

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Contrary to the assertion of the Dissent, Officer Fisher specifically testified he and Officer Gebhard did not block the doorway. N.T., 8/30/07, at 14–15.

room that had not been visible from the hallway. *Id.* at 9. In addition to the twisted baggie on the bed, he observed a calculator and razor blade on a tabletop. Officer Fisher noted, "In the past I've seen similar items in houses that are involved in drug dealing," and "when I combined all three [items] from my past experience[,] I asked him if he had any large amounts of cash on him or drugs." *Id.* at 9, 10. Appellant removed "a large folded wad of cash and a single orange bag of what [the officer] believed to be crack cocaine." *Id.* Officer Fisher testified that Appellant "produced it on his own." *Id.* at 10, 11. Upon pointed questioning by the suppression court, the officer continued, "He just responded ... that he did have that stuff and then he took it out of his pockets." *Id.* at 11.

¶ 9 Based upon his past experience, Officer Fisher concluded that "the large amount of money and that little tiny bag of crack and the calculator and razor blade" indicated "there was probably more drugs somewhere in the apartment." *Id.* at 11. Therefore, the officer remarked to Appellant, "[T]hat's a lot of cash, that's just a little bit of drugs[,] it doesn't make sense to me that that's all you have. Do you have more drugs?" *Id.* at 11–12. Appellant "hung his head in shame ... then indicated that there was more in the dresser." *Id.* at 12. The officer "looked over [at] the dresser.... There was ... what appeared to be a similar plastic bag, the top portion of it hanging out the top." *Id.* at 11–12. Officer Fisher asked Appellant "if I could get the drugs out of the drawer." *Id.* at 13. The dresser contained "a few more bags of crack cocaine" and "a partial bundle of heroin." *Id.*

¶ 10 The patrolman assessed that "things still didn't seem to me that was what the quantity of drugs should be for the quantity of money he had. I asked

him again if he had any more drugs in the room." *Id.* at 13. Then Officer Fisher told Appellant "he didn't have to tell me where they were. Just to go get the rest of them and give them to me." *Id.* at 14. Appellant opened the closet and removed "a large bag of ... crack cocaine from the shirt pocket of a flannel shirt that was hanging in the closet." *Id.* at 13–14. At that point Officer Fisher placed Appellant in the police car and transported him to the Lebanon Police Department. *Id.* at 15.

¶ 11 The trial court evaluated the levels of interaction between police and citizenry and concluded that the instant occurrence was "a paradigm for what constitutes a 'mere encounter.'" Suppression Court Opinion, 10/24/07, at 7.

> This Court has noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio[,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Moyer,* 954 A.2d 659, 663 (Pa.Super.2008) (en banc) (quoting *Commonwealth v. Smith,* 575 Pa. 203, 836 A.2d 5, 10 (2003)).

■ ¶ 12 We agree with the trial court that the interaction herein **began** as a mere encounter; we do not agree that it

remained one. Police were on the premises looking for Appellant's neighbor, Ismael Oquendo. They did not make contact with that individual but instead encountered Appellant in his apartment when he opened his door as police stood knocking at Mr. Oquendo's room. Officer Fisher inquired about Mr. Oquendo and asked Appellant if they could enter Appellant's apartment rather than speak about Mr. Oquendo in the hallway. Appellant, who was free to decline, admitted the officers into his apartment.

¶ 13 The Dissent states that "police officers sought entry ... because they observed a sandwich bag with a twisted end...." Dissenting Opinion at 891. The record does not support this factual assertion. Officer Fisher specifically testified that his only intention was to locate the occupant of room 14, but Appellant, who was the occupant of room 15, opened his door. N.T., 8/30/07, at 5. When Appellant's guest exited and walked down the hall, Appellant did not shut his door; rather, he stood there talking to police with his door open. *Id.* at 7. When asked what he observed as he stood in the hallway, Officer Fisher stated:

> I could see approximately 90 percent of the room. It was a tidy room. It wasn't, you know, in shambles. The bed was made. In the middle of the bed there was a plastic bag, a plastic sandwich bag.
> Q. Could you describe that plastic sandwich bag?
> A. It was a plastic sandwich bag that was twisted. It was like twisted in a long manner and then it was like in a squiggly.

*Id.* Officer Fisher did not claim that he became suspicious or desired entrance to the room to see what else he could observe. He continued,

> I started to ask him about the person in Room 14 that I was there to try to make contact with. I asked if I could step inside the room because I really didn't want to talk about the person in Room 14 out in the hallway.

*Id.* at 8. Appellant admitted police to his room. It was at that point that Officer Fisher observed drug paraphernalia on the tabletop and asked Appellant if he had drugs or money. Appellant produced both from his pocket.

¶ 14 The Dissent also states that Appellant's admission of police to his room "could not have been intelligent or voluntary, as [his consent] was obtained under the false pretext of the search for Oquendo...." Dissenting Opinion at 891. There is absolutely nothing in the record that supports that there was a "false pretext" involved herein. Officer Fisher was the only witness who provided testimony at the suppression hearing. As noted *supra,* in conducting our review of a trial court's denial of a suppression motion, we may consider **only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.** *Commonwealth v. Graham, supra.* The uncontradicted evidence is that the patrolman asked to step inside Appellant's room to avoid inquiring about Oquendo in the hallway.

■ ¶ 15 At this point, police, who were lawfully on the premises, viewed the drug paraphernalia on the table, in plain view. The plain view doctrine permits the warrantless seizure of an object in plain view when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object. *Commonwealth v. Collins,* 950 A.2d 1041, 1045 (Pa.Super.2008) (*en banc*)(citing *Com-*

*monwealth v. McCree,* 592 Pa. 238, 924 A.2d 621, 628–29 (2007)).

¶ 16 Appellant's sole challenge to the applicability of the plain view doctrine assails the conclusion that the first two prongs were met.[3] We reject his claim. As we already have established that Appellant's admission of police to his room was voluntary, Officer Fisher's view of the paraphernalia was from a lawful vantage point. *See Commonwealth v. English,* 839 A.2d 1136 (Pa.Super.2003) (since the justifiable intrusion already occurred by consent, no further intrusion occasioned by the seizure of evidence which was in plain view).

¶ 17 Appellant's challenge to the second prong, that the incriminating nature of the items on the tabletop was not immediately apparent to police, also is meritless. There is no requirement that drug paraphernalia can be identified as such only when there is accompanying "white powder or green leafy substances on or around" it, as Appellant avers. Appellant's brief at 20. Thus, this claim is summarily dismissed. Officer Fisher's view of the items on the table occurred after he lawfully entered Appellant's apartment with consent, and his training and experience suggested the incriminating nature of the items. *Commonwealth v. Newton,* 943 A.2d 278, 282 (Pa.Super.2007).

¶ 18 It is clear that upon entering Appellant's room, Officer Fisher's experience and training in narcotics detection, n.t., 8/30/07, at 4, coupled with the presence of a twisted baggie on the bed and items used in drug distribution, indicated that Appellant may be involved in illegal drug activity. Officer Fisher simply asked Appellant whether he possessed drugs or large amounts of cash, and Appellant produced

both. At the suppression hearing, when the trial court pointedly inquired whether Officer Fisher directed Appellant to produce the contraband, he replied, "I did not, Your Honor. He produced it on his own. He just responded ... that he did have that stuff and then he took it out of his pockets." *Id.* at 11.

¶ 19 To recap, this record establishes that police were lawfully in Appellant's room, in that Appellant admitted the officers voluntarily. The Fourth Amendment right to be free of unreasonable searches and seizures, *In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161 (2001), is not violated when the holder of the right provides the officer with voluntary consent to enter the premises. *See, e.g., Commonwealth v. Strader,* 593 Pa. 421, 931 A.2d 630, 634 (2007) (warrantless seizure presumptively unreasonable under the Fourth Amendment subject to a few specifically established, well-delineated exceptions, such as when it is consensual, *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)); *Commonwealth v. Yancoskie,* 915 A.2d 111, 114 (Pa.Super.2006) (Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant) (citing *Georgia v. Randolph,* 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006)).

¶ 20 Moreover, Appellant's initial production of the drugs and money also was entirely voluntary. Where the underlying encounter is lawful, as here, voluntariness becomes the exclusive focus. *Commonwealth v. Bell,* 871 A.2d 267 (Pa.Super.2005). The Commonwealth has the burden to prove that a defendant consented to a warrantless search and seizure.

---

**3.** Appellant erroneously sets forth the plain view doctrine, contending it encompasses only two prongs. As noted above, the doctrine includes a third prong. We confine our analysis, however, to only the argument Appellant sets forth. *See* Appellant's brief at 19.

*Id.* Herein, police did not conduct a search of Appellant; indeed, there was no need to do so as Appellant voluntarily produced the illegal contraband on his person. "To establish a voluntary consensual search [or seizure], the Commonwealth must prove that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Id.* at 273 (citing *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 901 (2000)). As the United States Supreme Court stated in *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation."

¶ 21 Thus, the record supports that following a chance meeting, Appellant voluntarily admitted police to his room; therefore, police legitimately were on the premises. Upon their entry, the officers lawfully viewed drug paraphernalia in plain view that triggered, in conjunction with police training and experience, their belief that Appellant possessed contraband. The innocuous inquiry concerning whether Appellant had any drugs or cash, without any reference to items police viewed in the room, could not be described as interrogation. Appellant was not coerced in any way or placed under duress. His revelation of cash and crack cocaine was free and voluntary. Appellant fails to acknowledge that the instant interaction was a progression, insisting only that he did not admit police to his apartment voluntarily, and therefore, he was in police custody from the time the officers entered his room. We have determined that Appellant voluntarily admitted police to his apartment and under the totality of circumstances, produced the cash and

drugs in his pocket as a free and unconstrained choice.

¶ 22 Once Appellant revealed that he had cocaine and a large amount of cash, however, the nature of the interaction between Appellant and police changed. Following that production, we believe Appellant was in the functional equivalent of police custody. In determining that Appellant was not in custody, the Commonwealth and the suppression court focused upon Officer Fisher's revelation that his tone was conversational, he did not threaten Appellant, he never drew his gun, and he never placed Appellant in handcuffs. N.T., 8/30/07, at 12–15. Indeed, the patrolman described Appellant as "cooperative" and "polite" and "one of the nicest people I've come into contact with at 221 North 8th Street." *Id.* at 15. The suppression court opined that the absence of aggressive, confrontational police tactics in this scenario compelled its conclusion that Appellant was not in custody and therefore "not entitled to constitutional protections such as the one articulated in *Miranda.*" Suppression Court Opinion, 10/24/07, at 8. For the following reasons, we do not agree.

¶ 23 The key difference between an investigative and a custodial detention is that the latter "involves such coercive conditions as to constitute the functional equivalent of an arrest." *Commonwealth v. Pakacki,* 587 Pa. 511, 901 A.2d 983, 987 (2006). Moreover,

Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of … *Miranda* rights. *Commonwealth v. DiStefano,* 782 A.2d 574, 579 (Pa.Super.2001), *appeal denied,* 569 Pa. 716, 806 A.2d 858 (2002). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise

deprived of [his] freedom of action in any significant way." *Miranda, supra* at 444, 86 S.Ct at 1612, 16 L.Ed.2d at 706. "The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Commonwealth v. Gaul,* 590 Pa. 175, 180, 912 A.2d 252, 255 (2006), *cert. denied,* —— U.S. ——, 128 S.Ct. 43, 169 L.Ed.2d 242 (2007). Thus, "Interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Ingram,* 814 A.2d 264, 271 (Pa.Super.2002), *appeal denied,* 573 Pa. 671, 821 A.2d 586 (2003). "In evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances...." *Gaul, supra.*

> Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of [his] freedom of action in any significant way or is placed in a situation in which [he] reasonably believes that [his] freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his] freedom of action is being restricted.

*Commonwealth v. Clayton Williams,* 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (internal citations omitted). *See also Commonwealth v. Mannion,* 725 A.2d 196, 202 (Pa.Super.1999) (en banc) (stating whether person is in custody for *Miranda* purposes must be evaluated on case-by-case basis with due regard for facts involved); ... fact that defendant was focus of investigation is relevant for determination of (whether defendant was in "custody" but does not require per se Miranda warnings).

> Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

*Mannion, supra* at 200. Thus, the ultimate inquiry for determining whether an individual is in custody for *Miranda* purposes is "whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Commonwealth v. Pakacki,* 587 Pa. 511, 519, 901 A.2d 983, 988 (2006) (quoting *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

*Commonwealth v. Williams, supra* at 30–31.

¶ 24 We believe that the continued interrogation of Appellant after he produced the wad of cash and bag of crack constituted the functional equivalent of an arrest for *Miranda* purposes. Significantly, when Officer Fisher was asked whether he would have allowed Appellant to leave the room once he produced the money and drugs, the patrolman answered, "No." N.T., 8/30/07, at 25, 26.[4] Both officers were in uniform displaying a "badge of authority." *Id.* at 4. Officer Fisher stood within four or five feet of Appellant while

---

4. We emphasize, contrary to the Dissent's representation, that Officer Fisher testified that it was **after** Appellant produced the wad of cash and cocaine that Appellant would not have been free to leave. N.T., 8/30/07, at 25. This fact is one more indicator of how the tenor of the interaction changed after Appellant's voluntary production of cocaine and cash from his pocket.

fully armed, while Officer Gebhard, also armed, "remained in the doorway." *Id.* at 12, 25. Appellant was located in his residence, thereby leaving him with nowhere to go to terminate contact with the police. Most importantly, however, the continued questioning of Appellant represented subtle coercion that was designed to elicit a given response.

¶ 25 Custodial interrogation does not require that police "make a formal arrest, nor that the police intend to make an arrest." *Commonwealth v. Ingram,* 814 A.2d 264, 270 (Pa.Super.2002), *appeal denied,* 573 Pa. 671, 821 A.2d 586 (2003). Custodial interrogation has been defined as "questioning **initiated** by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 271 (emphasis in original) (quoting *Commonwealth v. Hoffman,* 403 Pa.Super. 530, 589 A.2d 737, 744 (1991)). "Interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." *Ingram, supra* (citing *Commonwealth v. Hughes,* 536 Pa. 355, 639 A.2d 763 (1994)).

¶ 26 Given the circumstances of this case, where Appellant was in his own room and therefore had nowhere to go, Appellant could reasonably believe that his freedom of action was restricted. *See Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1133–34 (2007) (test for determining whether a suspect is in custody "is whether he is physically deprived of his freedom in any significant way or placed in a situation in which he reasonably believes that his freedom of action or movement is restricted," (citing *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311, 314 (1983)). Moreover, Officer Fisher's con-

tinuing questions to Appellant constituted an interrogation. Appellant had voluntarily revealed a $20.00 bag of crack along with a wad of cash that indicated to Officer Fisher, when combined with drug paraphernalia and the baggie for storing contraband, that Appellant must have a larger quantity of drugs in his possession. Thus, the patrolman should have known that his questions at that point were reasonably likely to elicit an incriminating response from Appellant. *Commonwealth v. McAliley,* 919 A.2d 272 (Pa.Super.2007) (interrogation under *Miranda* refers to both express questioning and words or actions on part of police that they know or should know are reasonably likely to elicit an incriminating response from suspect).

¶ 27 In the case *sub judice,* where armed police stood within Appellant's apartment in close proximity to him, and the officer's pointed questions followed Appellant's production of contraband from his person, we believe the persistent questioning about the existence of more drugs occurred under conditions that were reasonably likely to elicit an incriminating response. Thus, the instant record supports the conclusion that Officer Fisher should have given Appellant *Miranda* warnings once Appellant freely produced the cash and crack from his pocket. *See Commonwealth v. Dewar,* 449 Pa.Super. 517, 674 A.2d 714, 717 (1996) (*Miranda* rights attached where suspect was in custody and subjected to functional equivalent of express questioning "i.e., interrogation").

¶ 28 This finding, however, does not conclude our review of the issue. Once Appellant voluntarily produced the contraband on his person, the doctrine of inevitable discovery[5] became applicable since

---

5. Although neither the Commonwealth nor the trial court referenced the inevitable discovery doctrine, it is clear that we can affirm the trial court on an alternative basis. *See*

clearly, police ultimately would have discovered the drugs in the drawer and in the closet. Under the inevitable discovery exception to the exclusionary rule, the fact that challenged evidence was obtained as a result of illegal government conduct does not end the inquiry into whether the evidence was admissible at trial.

¶ 29 Pennsylvania courts recognize the inevitable discovery doctrine first described by the United States Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *Commonwealth v. Ingram, supra; see also Commonwealth v. Jones*, 928 A.2d 1054 (Pa.Super.2007), *appeal granted*, 597 Pa. 58, 950 A.2d 265 (2008). That doctrine provides that "evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence." *Commonwealth v. Ingram, [supra]* at 272.... [I]mplicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality. *Jones, supra* at 1060–61.

¶ 30 If the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, then the evidence is admissible. *Nix v. Williams, supra*. "The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Id.* at 444 n. 4, 104 S.Ct. 2501. Thus, evidence that ultimately or inevitably would have been recovered by lawful means should not be suppressed despite the fact that its actual recovery was accomplished through illegal actions. *Id.* Suppressing evidence in such cases, where it ultimately or inevitably would have lawfully been recovered,

"would reject logic, experience, and common sense." *Id.* at 444, 104 S.Ct. 2501.

¶ 31 This exception to the exclusionary rule has been invoked on numerous occasions by Pennsylvania appellate courts as a basis for admitting evidence that was, or was claimed to have been, illegally obtained by the police or other government investigators. *See, e.g., Commonwealth v. Van Winkle*, 880 A.2d 1280, 1285 (Pa.Super.2005) (holding that evidence obtained after officer exceeded permissible scope of weapons frisk was admissible because it fell within the inevitable discovery exception); *Commonwealth v. Ingram, supra* (deeming evidence obtained as a result of involuntary confession admissible because it inevitably would have been discovered); *Commonwealth v. Miller*, 555 Pa. 354, 724 A.2d 895, 900 n. 5 (1999) (citing *Nix v. Williams, supra*, and noting that even if the evidence found in the defendant's home had been illegally seized, it "would have been admissible because it inevitably would have been discovered"); *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 702 n. 11 (1998) (in claim decided under federal and state constitutions, holding that even if warrantless search of defendant's home had been improper, suppression not required because the evidence inevitably would have been discovered); *Commonwealth v. Garcia*, 443 Pa.Super. 414, 661 A.2d 1388 (1995) (defendant not entitled to suppression of drugs in his pocket because they inevitably would have been discovered since police lawfully were permitted to search him incident to his arrest); *Commonwealth v. Hoffman, supra* (finding evidence recovered as a result of illegal search of defendant admissible because it would have been inevitably discovered); *Commonwealth v. Speaks*, 351 Pa.Super. 149, 505 A.2d 310 (1986) (evidence regarding discovery of marijuana in

defendant's residence properly admitted under inevitable discovery rule).

¶ 32 Once Appellant produced the wad of cash and the bag of crack cocaine, Officer Fisher had probable cause to arrest him and had facts supporting issuance of a warrant to search Appellant's apartment, whereby he inevitably would have discovered the other items of contraband in Appellant's room. *See Commonwealth v. Pakacki, supra* at 989 n. 7 (once defendant stated he had marijuana pipe and removed it from his pocket, police officer would have had probable cause to arrest); *Commonwealth v. Murphy,* 916 A.2d 679 (Pa.Super.2007) (court would examine totality of circumstances to determine whether probable cause for issuance of search warrant exists). As the *Nix* Court stated, "Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix v. Williams, supra* at 446, 104 S.Ct. 2501. Accordingly, Appellant's motion to suppress was properly denied. *See Commonwealth v. Ingram, supra* (despite *Miranda* violation, where evidence inevitably would have been discovered in search incident to arrest, motion to suppress was properly denied).

¶ 33 Judgment of sentence affirmed.

¶ 34 Judge KELLY files a Dissenting Opinion.

## DISSENTING OPINION BY KELLY, J.:

¶ 1 The police officers sought entry into Appellant's apartment because they observed a sandwich bag with a twisted end which in their experience was used to contain controlled substances. However, they saw nothing more. Therefore, at that time, although they lacked a warrant or probable cause to search Appellant's apartment, the focus of their investigation had clearly shifted from finding Mr. Oquendo, to investigating Appellant. Nevertheless, the police officers, in full uniform and displaying their "badge of authority," under the ruse of discussing the whereabouts of Mr. Oquendo in private, obtained his permission to enter.

¶ 2 The learned majority's affirmance relies heavily on the voluntary consent of Appellant to the entry of the police into his apartment. (*See* Majority Opinion, at 885–87). However, for consent to an otherwise illegal search to be valid, the consent must be unequivocal, specific, and voluntary. It is only where there is an intentional relinquishment or abandonment of a known right or privilege that an effective waiver can be found. The subject of a search must be made aware of his rights against a warrantless search for a waiver to be intelligent. *See Commonwealth v. Gibson,* 536 Pa. 123, 638 A.2d 203, 207 (1994).

¶ 3 Here, Appellant's consent could not have been intelligent or voluntary, as it was obtained under the false pretext of the search for Oquendo, with a show of authority by two armed, uniformed police officers. Furthermore, when the police entered Officer Fisher stood inside the room, and Officer Gebhard stood behind him "in the open doorway just like right inside the threshold." (Majority at 883). Two policemen stood between Appellant and his door; he could reasonably infer he was not free to go. Therefore, at the time the police entered and blocked Appellant's exit, he was effectively in police custody and should have received *Miranda* warnings.

¶ 4 Because I conclude that Appellant's consent to the search and investigation was not knowing or voluntary, and his statements were made without the benefit of receiving *Miranda* warnings, I believe

the evidence and the statements should have been suppressed. Therefore, I respectfully dissent.