J-A04008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                 :                  PENNSYLVANIA
                                           :

               v.                                   :
                                           :
                                         :

ANTHONY DION SHAW                   :
                                         :

             Appellant                 :    No. 302 MDA 2024

Appeal from the Judgment of Sentence Entered February 28, 2024
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0003023-2018

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED AUGUST 15, 2025**

Anthony Dion Shaw appeals from the judgment of sentence, entered in the Court of Common Pleas of Luzerne County, following his conviction of one count of first-degree murder.[1]  After review, we affirm.

The convoluted factual history of the case is as follows:  Cindy Ashton's body was found in her apartment in Wilkes-Barre, Pennsylvania, with multiple stab wounds on May 2, 2018.  Relatives that lived in a separate apartment in the same building as Ashton said that Shaw had been with Ashton the day prior to her body being discovered.  Surveillance footage also confirmed Shaw's presence at Ashton's apartment.

On May 3, 2018, New Jersey authorities responded to a call for a welfare check on Shaw.  An officer from the East Orange police department knocked

_____

[1] 18 Pa.C.S.A. § 2502(a).

on the door of Shaw's apartment and got no response. The building's superintendent then let the officer into Shaw's apartment, where the officer found Shaw bleeding out from a suicide attempt. As part of the response to Shaw's suicide attempt, officers searched his apartment and located several items, including a knife and suicide note. Pennsylvania authorities, continuing their investigation into Ashton's death, reached out to New Jersey authorities and discovered that Shaw was in the hospital. The Pennsylvania authorities continued conducting their investigation, eventually searching Shaw's vehicle and apartment with assistance from New Jersey authorities.

Shaw was charged with one count of first-degree murder on October 4, 2018. On December 10, 2018, Shaw filed an omnibus pretrial motion to suppress evidence. On June 28, 2019, the trial court held a suppression hearing on and, on August 5, 2019, granted Shaw's motion, and ordered the suppression of the challenged evidence, concluding the evidence had been illegally obtained because of the warrantless entry and search of Shaw's apartment by the East Orange authorities in response to the welfare check. The trial court's decision was overturned by this Court on appeal, and the case was remanded for the trial court to consider the application of the inevitable discovery doctrine. *See Commonwealth v. Shaw*, 240 A.3d 898 (Pa. Super. 2020) (Table).

On remand, the trial court held two hearings in March and May 2022, to consider Shaw's omnibus pretrial motion to suppress all evidence[2] introduced by the investigatory "taint team."[3]  James Noone, a detective for the Luzerne County District Attorney's Office, testified on behalf of the Commonwealth at

---

[2] This included what Shaw deemed

all fruit of the warrantless apartment entry including:  all samples of Shaw's blood, all clothing, shoes, bags, toothbrush, shaving kit, washcloths, keys, knives, knife packaging, phones, phone cases, notes, documents, mail, computers, prescriptions, wallet, debit cards, receipts (Fuel One), photographs, and surveillance videos/photos from Shaw's apartment complex, Fuel One gas, and 116 Nicholson Street; all items seized from his vehicle including: all samples of Shaw's blood, all fingerprints, the Gerber Knife packaging, photographs, receipts (Kmart), Kmart surveillance videos/photos, items Det[ective] Reh purchased at Kmart, and any testimony about Kmart; all fruit of his interviews including: all of Shaw's statements, Movies 14 tickets, receipts, and surveillance video[;] all evidence and reports related to his May 11, 2018 and October 29, 2021 DNA samples[;] and any evidence, recordings, and/or interviews relating to Shaw's incarceration at LCCF.

**See** Appellant's Omnibus Motion, 12/30/21, at 10.

[3] The record from Shaw's prior suppression, held on June 28, 2019, was incorporated into the record of the March and May 2022 hearings, and formed part of the basis for the trial court's ultimate order suppressing evidence on August 11, 2022.  The first time the issue was raised below, the trial court suppressed the challenged evidence, finding that New Jersey's community-caretaking doctrine did not apply to the challenged evidence.  **See Shaw**, 240 A.3d at *6-7.  The trial court did not initially consider the applicability of the inevitable discovery doctrine and failed to address the Commonwealth's request to supplement the record in support of its inevitable discovery argument.  **Id.** at *8.  We affirmed the trial court's ruling on the applicability of New Jersey's community-caretaking exception but reversed the denial of the Commonwealth's request to supplement the record, vacated the suppression order, and remanded for further proceedings consistent with our memorandum.  **Id.**

the March 31, 2022 hearing. Detective Noone was assigned to investigate the May 2, 2018 homicide of Cindy Ashton. *See* N.T. Hearing, 3/31/22, at 6. Investigators, which included the Wilkes-Barre Township Police Department, were on scene when Detective Noone arrived and informed him that there was a deceased female inside the residence at 134 Nicholson Street. *Id.* Detective Noone enlisted the Pennsylvania State Police (PSP) forensic unit to process the scene. *Id.* at 6-7.

There was no evidence of a forced entry, and Detective Noone was informed that the apartment had been locked when the investigators and first responders arrived. *Id.* at 6-7. Detective Noone relayed that this indicated to him that Ashton may have known the assailant. *Id.* at 7. The PSP processed the scene, taking photographs and collecting evidence, such as blood swabs. *Id.* at 7-8. Ashton's body was found in the bathroom, which Detective Noone described as "very bloody," with blood covering "most of the floor in the bathroom[,]" and "splattered throughout the bathroom on the walls, the vanity, [and] inside the tub[.]" *Id.* at 8. Detective Noone observed that Ashton had multiple stab wounds. *Id.* at 9. There were bloody bandages in the bathroom and at the bottom of a laundry bin in the basement of the apartment. *Id.* at 28. No suspected murder weapon was found in the apartment, which led Detective Noone to believe the murder weapon had been removed from the scene. *Id.* at 9.

Detective Noone next interviewed individuals that lived in the apartment building, including Cheryl and Tracey McCoy, Ashton's aunt and uncle, who

lived in an apartment on the floor above Ashton's. *Id.* at 10. Tracey relayed that he received a text from Shaw in the morning hours of May 1, 2018, stating that he was coming up to Wilkes-Barre to speak with Ashton; in particular, Shaw mentioned to Tracey that he needed to speak with Ashton "about her dishonesty." *Id.* at 10, 12. Tracey also informed Detective Noone that Shaw picked him up around noon and they went to work out together at the Odyssey Fitness center that same day. *Id.* at 11. Tracey observed Shaw pay for a daily pass at the gym, which required him to provide his driver's license and credit card for payment. *Id.* Tracey told Detective Noone that he and Shaw exercised until around 2 p.m. before Shaw dropped him back off at his apartment. *Id.* at 11-12. Tracey also described Shaw's car to Detective Noone as a silver Ford Taurus.[4] *Id.* at 12. Shaw told Tracey that he was going to go to the mall until Ashton came back. *Id.* at 12.

Tracey also described to Detective Noone that, when he took his trash out that night, he did not hear any noise coming from Ashton's apartment or see her kitchen light on, which he considered weird. *Id.* at 13. When he woke up and went for his morning walk around 7:30 a.m. on May 2, 2018, Tracey noted that Ashton's car was not in its usual spot in the garage, but Shaw's vehicle was still parked out front. *Id.*

Cheryl interacted with Shaw inside Ashton's apartment on May 1, 2018, around 7 p.m. *Id.* at 15. Cheryl relayed to Detective Noone that, while she

---

[4] Noone noted in his testimony that a Ford Taurus and a Mercury Sable, the vehicle Shaw was actually driving at the time, are "identical." *Id.* at 12.

was assisting Ashton with purchasing a bus ticket online, Shaw entered the front door of the apartment, gestured to say hello, walked into the bathroom, and had not reemerged by the time she left the apartment. *Id.* at 16. She described his demeanor as "cold." *Id.* at 21.

Detective Noone testified regarding efforts made to obtain evidence from Shaw's trip to Odyssey Fitness. *Id.* at 16. Detective Noone said an investigator was sent to the fitness center, where they were able to confirm that Shaw had been there on May 1, 2018, used his credit card, turned over his ID, and purchased a day pass. *Id.* The investigators were also able to obtain receipts from Shaw's transaction. *Id.*

Detective Noone also testified about security footage recovered from Nicholson Street and Ketchum Street. *Id.* at 17-18. Footage from a camera located at 116 Nicholson Street showed Shaw's vehicle parked outside of 134 Nicholson Street, Ashton's residence, at approximately 6:52 p.m. on May 1st and at 7:48 a.m. on May 2nd. *Id.* at 18. Cameras at 16 and 45 Ketchum Street showed Ashton's car being moved with a "male[ with] a larger build" exiting the vehicle and leaving it on Ketchum Street on the morning of May 2nd. *Id.* at 18-19.

Based upon the information received throughout the investigation thus far, Detective Noone decided to run an intel report on Shaw, which returned a list of addresses. *Id.* at 19-22. The first address returned was 74 South One Street. *Id.* at 23. However, running Shaw's driver's license through the New Jersey Department of Transportation's database returned a different

address. *Id.* Detective Noone's department also determined that Shaw owned a 2003 Mercury Sable. *Id.*

Detective Noone testified about the efforts made to contact Shaw, which included having Tracey twice call Shaw directly. *Id.* at 24. Because Shaw did not answer either call placed by Tracey, Wilkes-Barre investigators then reached out to the New Jersey authorities, who informed them that Shaw was in the hospital. *Id.* at 24-25.

While the majority of Detective Noone's testimony detailed what took place on May 1st and 2nd, two officers from the East Orange Police Department testified at the June 28, 2019 hearing as to their role in Shaw's case, which began on May 3, 2018. *See* N.T. Hearing, 6/28/19, at 4, 20. Officer Sherise Wilson testified that she responded to a welfare check for an individual located at 74 South Munn Avenue, East Orange, New Jersey.[5] *Id.* at 5. After she knocked on the door at the South Munn Avenue residence and received no response, Officer Wilson was let into Shaw's apartment by the building's superintendent. *Id.* at 6. Upon entering the apartment, Officer Wilson observed blood on the floor and began looking for an injured individual, coming upon Shaw in his bedroom. *Id.* at 7-8. Shaw informed her that he had tried to kill himself. *Id.* at 9. As part of her search of Shaw's apartment, Officer Wilson found and read through Shaw's notebook, which contained a

---

[5] Officer Wilson incorrectly stated that the address was "74 East Munn Street."

suicide note with an apology to Ashton and her family. *Id.* at 16-17; *see also* N.T. Hearing, 3/31/22, at 47.

At the same 2019 hearing, Officer Michael McCusker testified to his role in responding to Shaw's suicide attempt on May 3, 2018. N.T. Hearing, 6/28/19, at 20. Officer McCusker testified that a knife and a notebook containing a suicide note were recovered. *Id.* at 21. He testified that he was contacted by law enforcement officials from Luzerne County a couple days later, who informed him that Shaw was a suspect in a homicide they were investigating. *Id.* at 23. Officer McCusker informed them that Shaw was in the hospital. *Id.* at 36. Officer McCusker was also instructed by the Essex County prosecutor's office to assist the Luzerne County district attorney's office with their investigation. *Id.* at 23. He found Shaw's vehicle at the request of the Luzerne County officials, informed them of what they had discovered in Shaw's apartment on May 3rd, and let them into Shaw's apartment to investigate. *Id.* at 35-38. Officer McCusker explained how the Pennsylvania investigators provided search warrants for Shaw's vehicle and apartment, as well as the evidence collected from his apartment and stored in the East Orange police department's evidence locker. *Id.* at 23-26. Search warrants were then obtained in New Jersey for the same subjects. *Id.* at 25-26.

Following the cooperation with New Jersey authorities, Detective Noone was also able to review additional surveillance footage. He reviewed the surveillance footage obtained from the Wilkes-Barre Kmart, which showed

Shaw entering the store just after 6 p.m. on May 1 and purchasing, inter alia, a Gerber knife. *See* N.T. Hearing, 3/31/22, at 36-37. Detective Noone also reviewed surveillance footage from Shaw's apartment taken on the morning of May 2nd. *Id.* at 39-40. Detective Noone was assisted by New Jersey authorities in searching Shaw's apartment. *Id.* at 45. One item that turned up during Detective Noone's investigation was Shaw's suicide note, which contained an apology written by Shaw to Ashton's family. *Id.* at 47.

Throughout his testimony, Detective Noone detailed the steps he would have taken had the investigation not overlapped with the investigation conducted by the East Orange police department. *See id.* at 25 (Detective Noone stating what he would have done after locating Shaw's residence if he had not been informed that Shaw was in hospital); *id.* at 30 (stating what he would have done if he had located Shaw's vehicle); *id.* at 35 (stating what he would have done if search of Shaw's vehicle resulted in finding Kmart receipt and knife packaging); *id.* at 41 (stating he would have obtained search warrant for Shaw's apartment); *id.* at 50 (stating what he would have done if he had found Shaw injured in his apartment); *id.* at 52-53 (stating what he would have done had he recovered cell phone from Shaw's apartment).

In October 2021, after the initial investigation and this Court's remand of the case from appeal, the Commonwealth enlisted State Trooper Brian Noll to pursue an independent investigation[6] of the homicide. *See* N.T. Hearing,

---

[6] Also referred to as the "taint team" investigation.

3/31/22, at 67. Trooper Noll was provided with a redacted investigative file regarding Ashton's death. *Id.* Trooper Noll conducted his investigation as if starting from scratch based upon the investigative file, which included "videos, pictures, bandages, and witness interviews" from the initial investigation. Commonwealth's Brief, at 15. Trooper Noll applied for and was granted a warrant to obtain a DNA sample from Shaw. *See* N.T. Hearing, 3/31/22, at 70. Noll subsequently applied for and was granted search warrants for various searches that had taken place during the initial investigation. *See id.* at 73-75 (discussing requesting search warrant for Shaw's vehicle); *id.* at 75-76 (discussing requesting a search warrant for the contents of Shaw's vehicle: the Kmart receipt and Gerber knife packaging); *id.* at 80-82 (discussing requesting search warrants for surveillance footage at Ashton and Shaw's apartments); *id.* at 83-84 (discussing requesting search warrant for Shaw's apartment and contents thereof). In each instance, Trooper Noll prepared the search warrant, presented it to an issuing authority, and then obtained the relevant evidence from either the Wilkes-Barre or East Orange police departments.

Following the above hearings, the trial court denied Shaw's omnibus pretrial motion to suppress all evidence introduced by the taint team. The trial court reasoned that, based upon the testimony presented by Tracey and Cheryl McCoy and Detective Noone, the Commonwealth met its burden to establish all evidence obtained by law enforcement "would have ultimately or inevitably been lawfully discovered." Trial Court Memorandum, 8/11/22. On

September 30, 2022, Shaw filed a petition for permission to appeal, which was denied. At a non-jury trial, Shaw was found guilty of first-degree murder and sentenced to life imprisonment without parole. Shaw filed a timely notice of appeal, and Shaw and the trial court have complied with Pa.R.A.P. 1925. Shaw raises the following issues for our consideration:

(1) Did the trial court err by applying the inevitable discovery doctrine to this case?

(2) Did the trial court err in concluding that the admission of text messages was harmless error?

Appellant's Brief, at 5.

Shaw's first claim relates to the trial court's invocation of the inevitable discovery rule in denying his suppression motion. When reviewing a challenge to the denial of a suppression motion, our standard of review is as follows:

[w]here the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the court[] below are subject to our plenary review.

*Commonwealth v. Kemp*, 195 A.3d 269, 275 (Pa. Super. 2018) (quoting *Commonwealth v. Jones*, 98 A.2d 649, 654 (Pa. 2010)) (internal quotations omitted). Because the Commonwealth prevailed before the suppression court below, "we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.*

- 11 -

Shaw argues that the inevitable discovery doctrine is inapplicable here for several reasons: (1) contingencies existed that might have precluded a lawful discovery; (2) the Commonwealth cannot establish a "truly independent" source for discovery; and (3) the Commonwealth failed to develop a record of a set plan or show that the evidence would have inevitably been discovered. Appellant's Brief, at 20-22. He is entitled to no relief.

Evidence obtained by police through an unlawful search may not be used in any respect, including as evidence at trial against the subject of the search, except in certain limited circumstances. *See Commonwealth v. Fulton*, 179 A.3d 475, 489 (Pa. 2018). Such evidence may only be used under certain exceptions, such as when the evidence would have "inevitably been discovered without reference to the police error or misconduct." *Id.* at 489 (citation omitted). The prosecution carries the burden of establishing, by a preponderance of the evidence, that illegally obtained evidence would have ultimately or inevitably been discovered by legal means. *Id.* at 490.

The inevitable discovery doctrine is "an extrapolation from the independent source doctrine:[7] [s]ince the tainted evidence would be admissible if in fact discovered through an independent source, it should be

---

[7] The independent source doctrine "allows admission of evidence wholly independent of any constitutional violation." *Commonwealth v. Berkheimer*, 57 A.3d 171, 188 (Pa. Super. 2012). The Commonwealth argues that the independent source doctrine applies here based upon Trooper Noll's independent investigation. *See* Commonwealth's Brief, at 21-26. As our decision solely rests upon inevitable discovery grounds, we will not address the Commonwealth's argument here.

admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539 (1988). The Commonwealth "must demonstrate that the evidence would have been discovered absent the police misconduct, not simply that they somehow could have lawfully discovered it." *Commonwealth v. Perel*, 107 A.3d 185, 196 (Pa. Super. 2014). The inevitable discovery doctrine "necessarily deals with hypothetical events that did not actually occur, [and] its application relies upon predictability and a routine of actions on the part of the investigating officers." *Commonwealth v. Elverton*, 311 A.3d 592, *48 (Pa. Super. 2023) (Table)[8] (internal quotation marks and citation omitted).

"The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Commonwealth v. Gonzalez*, 979 A.2d 879, 890 (Pa. Super. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.4 (1984)). Suppressing evidence in such cases, where it ultimately or inevitably would have lawfully been recovered, would reject logic, experience, and common sense. *Gonzalez*, 979 A.2d at 890.[9]

---

[8] *See* Pa.R.A.P. 126(b) (unpublished non-precedential decisions of this Court issued after May 1, 2019 may be cited for their persuasive value).

[9] Both parties cite to New Jersey case law in their briefs because the illegal entry and searches took place in New Jersey. New Jersey's law on inevitable discovery is similar to our own, such that applying it would lead to the same conclusion we reach here. *See State v. Camey*, 217 A.3d 106, 117-120. Under New Jersey law, the inevitable discovery doctrine requires the
*(Footnote Continued Next Page)*

Here, the Commonwealth has met its burden to establish inevitable discovery based upon the evidence collected prior to the Pennsylvania authorities' investigation becoming intertwined with the East Orange Township police department's investigation. Before contact was made with the authorities in East Orange, Detective Noone had already determined that Ashton's death was a homicide, identified Shaw as a suspect based upon him being the last person seen with her alive, recovered surveillance footage showing Shaw moving Ashton's vehicle away from her residence, obtained an address for Shaw in New Jersey, and begun searching for Shaw in New Jersey to surveil him and his vehicle. Furthermore, Detective Noone repeatedly testified as to what would have been done, in light of the evidence initially recovered, had the New Jersey police not become involved in the matter.[10] *See* N.T. Hearing, 3/31/22, at 25-26, 30-36, 39-41, 45-53 (Detective Noone explaining what steps he would have taken based upon, inter alia, locating Shaw in New Jersey, finding a receipt and knife packaging in his vehicle, recovering his cell phone, etc.).

_____

proponent to "present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered." *Id.* at 117 (quoting *State v. Sugar*, 527 A.2d 1377, 1380 (N.J. 1987)

[10] We note that the trial court found Officer Noone credible regarding what steps he would have taken had his investigation not been impeded by the New Jersey authorities' investigation. *See* Trial Court Memorandum, 8/11/22.

Based upon the above, the Commonwealth demonstrated by a preponderance of the evidence that, notwithstanding the unlawful search of Shaw's apartment by the East Orange police department, the evidence would have been discovered by lawful means. ***See Commonwealth v. Davis***, 241 A.3d 1160, 1173 (Pa. Super. 2020) (citing ***Berkheimer***, 57 A.3d at 188).

Shaw's arguments to the contrary are unavailing. He argues that the inevitable discovery doctrine is inapplicable when any contingencies exist that might preclude a lawful discovery, yet he fails to cite any binding case law in support of that notion. ***See*** Appellant's Brief, at 29 (citing ***United States v. Stokes***, 733 F.3d 438 (2d Cir. 2013)). We are unaware of any Pennsylvania case law imposing such a limitation, and we will not create any such rule today.

Shaw also claims that the inevitable discovery doctrine should not apply here because the Commonwealth did not establish a "truly independent source." Shaw cites to ***Berkheimer***, 57 A.3d at 176, for the proposition that willful police misconduct triggers the requirement for a truly independent source for an inevitable discovery. However, the situations in which this requirement is applied have been limited by the Supreme Court of Pennsylvania. ***See Commonwealth v. Katona***, 240 A.3d 463 (Pa. 2020). In ***Katona***, the Court held that the "truly independent source" requirement only applies when the police misconduct in question constitutes "willful misconduct" or "malfeasance." ***Id.*** at 479–80. Police conduct rises to that level when it constitutes "egregious misconduct," such as an illegal invasion

into a private dwelling via the use of a battering ram. *Id.* at 480 (citing *Commonwealth v. Mason*, 637 A.2d 251 (Pa. 1993)). Here, we do not find that the New Jersey police's actions in illegally accessing and searching Shaw's apartment—having a superintendent unlock the front door in response to a wellness check request and searching the apartment as part of a suicide investigation—rise to the level of "egregious misconduct," such that a truly independent source is needed to apply the inevitable discovery doctrine.

Shaw's contention that the Commonwealth did not have a sufficiently detailed plan to make a lawful seizure and inevitably discover the contested evidence is likewise incorrect, as Detective Noone's testimony amply set forth the manner in which he would have pursued Shaw in New Jersey, notwithstanding the information gained from the illegal search of Shaw's apartment. *See* N.T. Hearing, 3/31/22, at 30-32 ("[W]e would put together a team to go to New Jersey. Our objective here is to locate [] Shaw."). Akin to *Nix*, where a search team was hours away from discovering a body before the search was called off due to information gained from an illegal interrogation, here, Detective Noone and the Pennsylvania investigators had one suspect they sought to locate when they reached out to New Jersey authorities: Shaw. While Detective Noone and the Pennsylvania authorities cannot say definitively how many hours away they were from searching or attempting to surveil Shaw's apartment or requesting a warrant, all roads in their investigation up until that time led to Shaw, and Detective Noone

testified to that effect.[11]  Our precedent does not require a more specific hypothetical timeline of discovery than that.  **See Nix, supra**; **see also Commonwealth v. Long**, 174 A.3d 44 (Pa. Super. 2017) (Table) (applying inevitable discovery doctrine where police "would have inevitably" run a license plate check, although no definitive timeline was established).  Accordingly, the trial court properly denied Shaw's suppression motion.

We next turn to Shaw's challenge to the trial court's admission of text messages.  At trial, the court admitted several text messages exchanged between Shaw and Ashton, which Shaw claims "involve [his] motive to murder Ashton and implicate [his] mens rea, particularly, the specific intent to kill." Appellant's Brief, at 17.  Shaw notes that, in its closing statements, the Commonwealth argued that these text messages "demonstrated [Shaw's] mindset . . . [and are] demonstrative of a ruthless plan that he had concocted." **Id.** (quoting N.T. Trial, 2/27/24, at 204-17).  Shaw argues that these messages were improperly admitted because they constituted hearsay, and that their admission did not constitute harmless error, because "the text messages alone . . . [were] the only evidence of motive, premeditation, and

_____

[11] A succinct summary of the relevant timeline clarifies the point:  Ashton's body was discovered and the Pennsylvania authorities' investigation began on May 2nd.  New Jersey authorities responded to a welfare check on Shaw and searched his apartment on May 3rd, completely independently of the events of May 1st and 2nd.  Pennsylvania authorities reached out to New Jersey authorities to ascertain Shaw's whereabouts on May 4th, by which time, based upon only their investigation up until that point, they had narrowed in on Shaw as their primary suspect.

the specific intent to kill." Appellant's Brief, at 23, 59-62. He is entitled to no relief.

The admission of evidence is within the sound discretion of the trial court and will only be reversed upon a showing of an abuse of discretion. *See Commonwealth v. Safka*, 141 A.3d 1239, 1248–49 (Pa. 2016). An abuse of discretion "will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will." *Commonwealth v. Frein*, 206 A.3d 1049, 1072 (Pa. 2019) (quoting *Commonwealth v. Eichinger*, 915 A.2d 1122, 1140 (Pa. 2007)).

The messages Shaw challenges do not constitute hearsay. A statement made by and offered against an opposing party is not hearsay. Pa.R.E. 803(25)(A). Additionally, a statement against interest is not hearsay. Pa.R.E. 804(3). Here, the text messages admitted included Shaw questioning Ashton regarding messages he saw on her phone that he believed to be from her ex-boyfriend and others where he informed her that he was "in town at the gym." *See* N.T. Trial, 2/27/24, at 213-17. As noted by Shaw himself, the text messages serve as evidence of Shaw's motive and his specific intent to kill. *See* Appellant's Brief, at 61. Therefore, because the texts are statements made by Shaw and against his interest, we do not consider the trial court's admission of them to be an abuse of discretion.

Second, even assuming, arguendo, that the messages were hearsay, their admission was not a reversible error. Improperly admitted evidence need not be corrected if the court is "convinced beyond a reasonable doubt that the error is harmless." ***Commonwealth v. Murray***, 248 A.3d 557, 576 (Pa. Super. 2021) (quoting ***Commonwealth v. Story***, 383 A.2d 155, 162 (Pa. 1978)). The harmless error doctrine applies where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming[,] and the prejudicial effect of the error was so insignificant by comparison[,] that the error could not have contributed to the verdict.

***Murray***, 248 A.3d at 576 (quoting ***Commonwealth v. Taylor***, 209 A.3d 444, 450 (Pa. Super. 2019)).

We agree with the trial court that the admission of the text messages was harmless error because the properly admitted proof of Shaw's guilt was overwhelming: Shaw was the last individual seen with Ashton alive; Shaw was discovered having attempted suicide and written a suicide/apology note apologizing to, inter alia, Ashton and her family; footage was recovered showing Shaw purchasing a knife at Kmart the night prior to Ashton's body being discovered; and the DNA analysis of the knife purchased by Shaw at

Kmart contained DNA of Ashton and Shaw.[12]  **See** N.T. Trial, 2/26-27/24, at 61-64, 105, 113-114, 157-161, 239-243.  We consider this evidence sufficient to hold that the uncontradicted evidence of guilt was so overwhelming that admission of the text messages, if in error, was harmless.  ***See Murray***, ***supra***.

Judgment of sentence affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 08/15/2025

_____

[12] The Commonwealth's expert in the field of DNA profiling's exact conclusion regarding the DNA evidence was that "it is 680 quattuordecillion times more likely in the Caucasian population, 1.7 tredecillion times more likely in the African American population, and 5.1 quinquadecillion times more likely in the Hispanic population that [the DNA profiles found on the Gerber knife] originated from [Ashton and Shaw] than if it originated from two other unknown, unrelated individuals."