J-S49031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
      :          PENNSYLVANIA
      :
v.       :
      :
      :
LARRY BERNARD HARCUM       :
      :
Appellant       :   No. 104 MDA 2018

Appeal from the Judgment of Sentence December 1, 2017
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0003877-2017

BEFORE:    SHOGAN, J., STABILE, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:          **FILED AUGUST 30, 2018**

Appellant, Larry Bernard Harcum, appeals from the judgment of sentence entered in the Court of Common Pleas of Lancaster County following his non-negotiated guilty plea to the charges of possession with the intent to deliver--heroin and Fentanyl ("PWID"), possession of drug paraphernalia, manufacture of a designer drug, and driving while under suspension ("DUS"), as well as his plea of *nolo contendere* to criminal conspiracy.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: On June 17, 2017, the Lancaster County Drug Task Force executed a search warrant at Appellant's residence and seized 12.18 grams of heroin mixed with Fentanyl,

---

[1] 35 P.S. §§ 780-113(a)(30), (32), (36); 75 Pa.C.S.A. § 1543(a); and 18 Pa.C.S.A. § 903, respectively.

---

\*    Former Justice specially assigned to the Superior Court.

numerous small rubber bands, two functional digital scales, rubber gloves, sandwich bags, a disposable face mask, a metal sifter, and U.S. currency. Appellant was arrested and, on December 18, 2017, represented by counsel, he entered a guilty plea and *nolo contendere* plea as indicated *supra*. He then proceeded immediately to a sentencing hearing.

At the hearing, the Commonwealth set forth Appellant's offense gravity score, prior record score, and the guideline ranges for each crime. N.T., 12/18/17, at 2-3. The trial court acknowledged the guideline ranges and informed Appellant of the maximum penalty he could receive for each crime. *Id.* at 3-4. The trial court acknowledged that it reviewed a pre-sentence investigation report ("PSI"). *Id.* at 7. The trial court noted Appellant was forty-four years old and suffered from post-traumatic stress disorder ("PTSD"). *Id.* at 7-8.

After requesting a sentence in the mitigated range with respect to each charge, Appellant's counsel informed the trial court of the following:

> [T]his is a complicated situation for [Appellant]. I note that he's been before Your Honor a number of times. He does have a long outstanding record. But I just want to show you a more complete picture of who [Appellant] is as a person.
>
> He's originally from the area. He did move around a lot. His father was in the military. He lived with his mother some and with his father. There's some incidents of sexual abuse towards my client when he was a bit younger. And in spite of that, he did succeed. He graduated from high school. He did two years at Jackson State College in Mississippi, and he also has taken some business certification classes while here in Lancaster.
>
> [A]s Your Honor knows from the PSI, he was with the United States Navy for a period, and he does have interest in taking care

- 2 -

of people in communities. You'll hear more about this[.] But there is a letter from the Lancaster County Prison speaking about how [Appellant] has been very helpful to some of the detoxing inmates there. And I submit to you that this is his personality. He's a giving person.

It's mentioned in the PSI, it's mentioned that he does like to mentor people. And I know maybe on its face standing here, charged with these things, it doesn't look so good. But I would submit to Your Honor sometimes the people that have the experience have some real wisdom. I do think [Appellant] is ultimately a wise and grounded person.

I just think that, Your Honor, [] the interest of the state and the benefits to our society are not served by anything beyond the mitigated sentence. [Appellant] is here taking responsibility, and before Your Honor's mercy hoping that you'll see not only what he's charged with here, but everything throughout his life. Certainly, he's not making any excuses, but just to kind of understand the fuller picture of who he may be.

Finally, if I will, he does have some family support here. I know his sister and niece are here as well as his fiancée, Bianca. If Your Honor wishes perhaps they could address the Court if they have something to say. But, in any case, that would be my argument and mitigation.

*Id.* at 16-18.

Appellant's fiancée made a statement to the trial court. She informed the trial court that it is "kind of hard to judge [Appellant] from the outside looking in." *Id.* at 18. She indicated (verbatim):

The majority of the people that he's been through as a kid he probably would be a lot worse off. He grew up very poor and dysfunctional but, you know, and you notice that's probably the average now. But I look at him and you guys look at him and he had a hard life. So that's all I have to say.

*Id.* at 19.

Appellant's counsel informed the trial court that he was in possession of a letter from Appellant's prison counselor, Nicole Dixon, and with the trial court's permission, he read the letter into the record for sentencing purposes. Specifically, Ms. Dixon indicated the following in her letter, which was dated October 2, 2017:

> To whom it may concern, my name is Nicole Dixon and I [am a] treatment counselor for Lancaster County Prison. I run the intake block at LCP.
>
> [Appellant] has been a calming influence on G-1, especially with detoxing inmates. He helps staff de-escalate situations that could become a problem. I've watched [Appellant] continuously grow and become a positive role model on the block. He has even started up a group with inmates to discussion [sic] ways to help their recovery. He always goes to Bible study and is a very religious person. I know [Appellant] is trying very hard to change his life and his way of thinking.
>
> If you have any questions for me, you can reach [me] at…. Thank you. Sincerely, Nicole Dixon, counselor at Lancaster County Prison.

*Id.* at 19-20.

Appellant's counsel suggested the following:

> [T]he fact is that [Appellant] was in Lancaster County Prison for some time and he did, it seems like he did, come to the realization of the pain and hurt that he's inflicted on people with selling drugs over the course of his lifetime. It mean, who knows why something clicks in somebody's mind. But, it actually seems—it actually seems from his actions in Lancaster County Prison during this time that it's clicked. I mean, I don't think he's bullcrapping with Nicole Dixon as far [as] this whole thing. And he actually did start a program that is working with inmates that he actually does address things with detoxing inmates[.]
>
> One thing that's interesting as far as the PSI, I believe there is no prior offenses [as] a juvenile that I can see. And the criminal activity started after the armed services, which I don't know if that

- 4 -

was the cause of the PTSD or [if] it goes even further. But it seems like where things started as an adult, not as a juvenile.

He did actually—he testified a few years ago, I believe, in a homicide case, a case in which he had been seriously injured o[n] another case.

\*\*\*

But he did cooperate with the Commonwealth and testified in a homicide here in Lancaster County.

And although the numbers, I can't say anything about the priors. They're there; they're in black and white. Although the one thing on the PSI which I have to bring up is the Philadelphia sentence. This is not in regards to the sentence. This is just in regards to credit. It has on page 9, I believe, October 14, 2015, he received seven years' probation on that but there was a detainer on, I believe, one of the earlier cases. He was sitting 11 months on that. And since he had got [*sic*] probation on the Philadelphia charge that time almost has to go somewhere, and I believe that time probably should go on [the instant docket].

\*\*\*

[Appellant] has been very honest and up-front with me in the brief time that I was talking to him. And I think upon his arrest I believe he was very cooperative with the detective as far as explaining how much money, criminal things would be in the house when they served the search warrant. So I think he was cooperative in that way.

*Id.* at 20-22.

Appellant made the following statement to the trial court:

[Defense counsel] was trying to explain in 2004 evidence was presented to the Lancaster County police officers, particularly [] Detective Burkhart, that I may have been involved in the kidnapping and homicide of a pregnant woman by the name of Christina Colon.

As they further investigation [*sic*], they realized that I didn't know her, I never met her. But I had accrued evidence about how and why she was murdered. I came forward with that evidence on my own fruition without any persuasion or threats from anyone or attempts to turn me into a cooperate [*sic*]. I did [it] out of the interests of justice. I put myself in a very violent length [*sic*]

- 5 -

situation where I risked my life and got Danny Schlaeger to admit to why he killed Christina Colon [and] where he buried Christina Colon. And I also continued to testify throughout the time and to help secure that conviction.

I just wanted to bring that to the Court to let you know that I'm not a malicious, deliberate[,] violent, and heinous person. I have a heart. I have a very big heart. And my heart was actually tested recently this year. Coming to LCP, I was offered the job on the intake unit. Why I was picked, I have no idea. I didn't put a request slip in. A sergeant came and asked if I wanted to work there, told me the benefits of it and I said sure.

And I wrote you a letter, Your Honor, and I didn't mention this in the letter, but I want to mention it now. Inside on LCP on the intake unit, I befriended a guy name[d] Eric. Eric and I both had a love for Scrabble and chess. We played Scrabble and chess all day every day. And I was maybe 15 or 16 years older than Eric.

And while playing chess we talked intimately about our families, about our past, about our futures and whatnot. And I asked Eric a question, Your Honor. I said to him, I said, Eric, like, I told him, like, you said you love your mother and your son and your daughter so much. Why do you keep putting this poison into your veins? No one is hurting your family. No one is hurting you. And he said, I don't know. Because I was surprise[d] at the question he asked me next.

He said, [Appellant], I see this…beautiful girlfriend of yours and you talk about your father in such a great way, like he's a great man, and you talk about your mother and all of your friends. But I'm going to ask you, why do you sell the poisons that addicts put into their body knowing it could hurt you and take you away from your family and take you away from your friends, take you away from your mother and your father? But he said something really strange to me that day. He said, let me ask a question. He said, would you trust a dying person that has no strength to hold a rope while you scale down a thousand foot cliff. I said, no. Why would I?

He said, so why do you trust all of those people with your life? He said, I never met a person of your ilk with your intelligence and with your heart, bro. And he said, you can do so much better in your life. And me and Eric that day, we bonded. But Eric wasn't in LCP for insignificant reasons. As fast as we bonded, he was released.

Weeks after that, a guy that knew of I and Eric's friendship came into the prison because on the intake unit, everybody that comes in I see first.

And I asked about Eric. What's up with E? And he said, man, big bro, he overdosed. I said, is he all right? He said, he died. I said, what? And he said, he died.

And that day I don't know what happened to me. I don't know what spirit came over me, but I felt a grief that I never felt in my life. And I've been through some stuff, Your Honor. But I never felt this grief. And it's crazy. That day I knew. I knew what I should have told Eric. If you love yourself, if you love yourself, Eric, that's the answer. You got to love you. If you love you, [you] would not put poisons into your veins. I would not sell poison to people. I would not hurt my mother. I would not burglarize. You would not burglarize. You wouldn't [] do anything to hurt humanity, because loving yourself, you love humanity.

And at that point, Your Honor, I wanted to change; not for me but for my family, for my friends and society. Because I know outside of all of the good that I've done for people, I've done it with the intent of taking from so many. And I never realized that until I talked to Eric.

So I devised a curriculum where I started at LCP without the permission of staff or anything. I wasn't out to become a martyr or any of those situations. I did it because I wanted to help. And I started this curriculum called DRUGS, Your Honor, which stands for Dirty Rotten Ugly Gloomy Society. And I broke down each category of drugs; each area of dirt, each area of rot, each area of ugliness and gloom and I asked them at the end, how does everything that you did with drugs affect our society?

And I turned the worst desolate [] into a unit of worthwhile inhabitants. People wanted to stay on that unit when they only supposed to stay 14 or 21 days, begging to stay on the unit.

And I said to myself, because I'm actually pretty much of a loner. If I can do this to people, who if I could bring this hope into people who are incarcerated and are forced by detention to want to seek this help, what could I do with people who are crawling on their hands and knees begging for help? And this is a gift that I've had all of my life. But the thing is my gift was overshadowed by greed, by the greed of the mighty God, the greed of wanting to help my family, of wanting to help my sisters and her children.

By the greed of wanting to just live better than I lived growing up. And that's why I sold drugs, Your Honor.

I'm not one of those guys who lived in opulence. I didn't drive fancy cars. I didn't have a bunch of jewelry. When they instituted the raid on my house they didn't find $3,000 televisions and 50 pairs of sneakers. I lived abstaining, bare necessity. But I helped everyone I could. I helped pay college tuitions. I helped Dustin Salisbury, who's a professional basketball player, get into a good college. I mentored other young athletes like Perry Patterson in Lancaster County.

And these men, although they are living across seas now, they looked up to me like a lot of other people. But they looked up to me for the wrong reasons, Your Honor. They didn't look at me for the greatness I could be; they looked up to me for the financial stability that I could provide for them, Your Honor.

I sit here today and I say to you that the district attorneys of Lancaster County come before you every day, every month, every year and ask you to sentence people that defy the laws of justice to the most time that the Court will allow. I ask you for the same sentence, Your Honor. But I ask you to find mercy in me, find mercy to a person that wants to help save, not one Eric, but 100 Erics. That is my devotion and my passion. That is not a game. Actually look into my eyes and see my eyes and feel my passion in my heart. Because I'm not Latif. That's my moniker on the street. I'm Larry Bernard Harcum, a father to a son that doesn't love me. I'm son to a dying father, Larry Harcum, Sr. I'm a son to Veronica Harcum. It's not just who you see in the papers. That's just the crimes that I committed. That is not who I am.

To be honest with you, I have never asked anyone to come to my sentencings because I knew I was going to re-offend. I knew I was going to try to reach that pie, that America pie that's so far away from people of my upbringing. So I never asked my sister, my girlfriends, my mother, my father, no one to come to my sentencing. I never stood before a judge and spoke like this.

Your Honor, I want to make a difference. I can make a difference. I wish you would know me. And I wish my spirit advisor, who started teaching me when I had no belief in God, I had no belief in anyone, all I believed in is the mighty dollar. And I wish he could come today and speak for me but the prison wouldn't allow him to. He's the person that started the resurrection of my soul.

I hated selling drugs all of my life. And that's 24 years of my life that I've been selling drugs. Most of the time it was marijuana and I moved on to the more lucrative drugs, which was heroin, cocaine.

I'm sorry. I'm sorry for the pillage that my drug dealing caused on people's lives. I'm sorry for the hurt that I caused other families. But I ask Your Honor today to listen to all the facts and understand my pain, understand my history, but know that I'm no longer that person. I have no idea where it come [*sic*] from, and I have no idea where I'm going. I know one thing for sure, Your Honor, I can make the valued [*sic*] difference in this opioid crisis. Thank you.

*Id.* at 23-30.

The trial court noted that it had received and reviewed Appellant's letter, which he sent to the trial court in November. *Id.* at 30.

The district attorney made the following statement for purposes of sentencing:

[Appellant] certainly has been taking care of people, giving and monitoring people since 1993, when he had two felony drug convictions. He then received another felony drug conviction in 2006 and then another one in 2014. In between 2006 and 2014— I'm sorry. He then got out in 2014 and picked up his 2015 case. That is a Pennsylvania State Police case where [Appellant] delivered heroin; .51 grams.

And [Appellant] was supposed to work with the Pennsylvania State Police. And actually, that offense occurred in 2013, June 12, 2013, and [Appellant] was supposed to cooperate. Due to his lack of cooperation, the charge was brought then in 2015.

Meanwhile, [Appellant] kept busy with his drug dealing and was charged on March 10th of 2016 by the Lancaster County Drug Task Force with 57.16 grams of Fentanyl. Then [Appellant] picked up the latest charge that he just pled guilty to today in 2017, which is heroin mixed with Fentanyl. So [Appellant] has definitely been taking care of people and mentoring them and giving [to] them; just not in the right way.

- 9 -

[Appellant] has no substantiated work history other than being in the United States Navy from 1991 until 1993 when he received an administrative discharge. From there, it appears by all intents and purposes that he decided not to pursue work like an honest citizen, supporting the community in that way, or supporting his family in that way, but instead dealing drugs and putting the poison into people's veins.

And not only that, but I believe you'll hear from Detective Kelly about [Appellant's] latest involvement with the 2017 charge of how he enlisted the aid of his fiancée [] in making sure that she was around in case one of his test subjects OD'd from the drug that he was going to share with others by helping them.

And least [*sic*] we forget, he has [an] extensive criminal record. Not only with selling drugs, but with harassment, mischief, disorderly conduct, accidents involving death or personal injury, noise ordinance, damage to unattended vehicles, driving under suspension, possession of a firearm and ammunition by a convicted felon, which is [in] the United States District, terroristic threats, a PFA, and another accidents involving death or personal injury. And then the aggravated assault, reduced to a simple assault, and recklessly endangering a person and terroristic threats.

So while its commendable [Appellant] would like [to] change his life now, he's had a long time to do so and he has chosen not [] to do so.

Additionally, the PSI talks about his drug use. I[t] states that he did marijuana, he did cocaine, yet never did he do heroin or Fentanyl. So he was not a drug user. We hear all the time about drug users are drug dealers to support their habit. [Appellant] did not use heroin. He just sold it, knowing that opiates are [a] huge problem in the United States. He has shown a total disregard for human life by his continued drug dealings since 1993.

He has also shown a disregard for law and its authority demonstrated by his continued drug dealing, and by his ten DUS's. I'm asking that there be no mitigation. There is absolutely [no] reason for mitigation on any of the docket numbers. Additionally, I ask that each docket number be consecutive to one another; we're talking about 2013, 2016, and 2017. [Appellant] has demonstrated he's not rehabilitatible [*sic*]. And if he really is, then he can do so once he gets out of state prison.

*Id.* at 30-33.

Detective Kelly, who investigated the instant crimes, provided information to the trial court for purposes of sentencing. Specifically, Detective Kelly informed the trial court that Appellant used a mid-level drug dealer, who is a heroin addict, to test the potency of his heroin mix. *Id.* at 34. Appellant admitted to Detective Kelly that he obtained Narcan and used it to revive the test subject. *Id.* Detective Kelly informed the trial court that, during the investigation, Appellant admitted that he sold heroin and Fentanyl to an individual, who then resold the mixture to a person who fatally overdosed. *Id.* at 35. Detective Kelly, who has been a member of the drug task force for four years, opined that Appellant is an "upper level dealer." *Id.* Detective Kelly further opined that "[d]espite [Appellant's] hard life and what he was saying, I don't think it excuses the fact that he's selling death to people and taking advantage of them, making lots of cash." *Id.* at 36.

The trial court indicated it was ready to impose sentence, and in so doing, the trial court specifically stated the following:

> Despite the comments that have been made today, despite whatever epiphany finally reached you in Lancaster County Prison, having reviewed this matter quite extensively and reviewed the information available to me, not only is this not a matter for a mitigated sentence, I don't even think the aggravated range that is provided by the guidelines is really reflected of what would be the proper sentence. I will not, however, exceed the aggravated range. I will not deviate from the guidelines but will be sentencing within the aggravating range.
>
> Among the reasons for doing so, [Appellant], are that you cannot excuse what you've done by the way you used the proceeds. And that is exactly what you did. And frankly, I find

- 11 -

that absolutely horrendous. This was one the saddest excuses for adding to the destruction of society that I've ever heard. But I used the money for a goo[d] cause. It didn't matter who died in the interim. It didn't matter that I knew I was breaking the law, I did it before, did it again, did it continuously, but I did good things with the money. Well, that really is not a justification for anything. In fact, it demonstrates to me a willfulness and a knowingness that I know I'm doing wrong but somehow I am subject to a different standard, and therefore, can justify my wrongdoing because I'm a nice guy.

It doesn't work that way. You have been actively, actively involved in the criminal justice system for 24 years, essentially, since you were discharged from the Navy. And in that time, I have seen no indication of any sense of responsibility or acknowledgment of the necessity to abide by the law, no hint of rehabilitation. And yet, all of these things could have come to you long before, long before now. The longest you ever stayed out of trouble are the periods when you were in state prison. That speaks volumes.

You say you're not a violent person. Terroristic threats and assault and violation a PFA, those are crimes and conduct of violence. They are dangerous. Possession of a firearm and ammunition by a convicted felon, that's a threat to society. And that doesn't even cover any of the many other greater and lesser offenses that are scattered throughout the last 24 years, other than to speak in terms of the consistency of your behavior being antisocial and sociopathic. What you have contributed to the degradation of our community defies words.

[APPELLANT]: Sorry, Your Honor.

THE COURT: I hope all of the addicts feel it. I hope they feel how sorry you are.

And for you to have committed 2017 offenses while you were on bail from the 2015 and 2016 [charges] is a slap in the face to the criminal justice system. It is a slap in the face of this Court, because you had actually been in my court on your cases before you got those new charges when they were pending. You knew. You knew you had pending charges. You knew you had the freedom to sit in that gallery because you had posted bail on one, was unsecured on the other and you knew that. But you, again, set yourself to a different standard. And that standard seems to excuse within your own psyche, your behavior, that you're not subject to the same laws as the rest of us and the same

- 12 -

restrictions as the rest of us, and the same necessity for obedience and self-control as the rest of us.

There is so much here that is outright distressing in terms of your contempt for society, for the law of society, for a safe society, and for the protection of society. When I sentence, I have to sentence based on the severity of the crime, its impact on the victim, direct and the broader community as a direct or indirect victim, the level of rehabilitation that I am able to glean from what is before me, as well as you as the individual.

I hope you, as the individual, have had the epiphany that has led you to the behavior and the helpfulness in Lancaster County Prison. But you can't come in here and tell me that you wanted to help mentor people and help your family and help students and pay tuition for people and somehow think that I'm going to find that as a mitigating justification for littering the county with heroin, Fentanyl and K-2. I see the detritus of those in my courtroom regularly. I see them in my neighborhood regularly. And the greed of those individuals who are, essentially, retailers with a drug inventory, they made their choice that this is a high-risk business and you've just hit the high-risk.

[APPELLANT]: Yes, ma'am.

THE COURT: And so having given this a great deal of thought, the sentences will be imposed as follows: as I said, the majority of these sentences…will be in the aggravated range.

*** 

On Docket Number 3877 of 2017, on Count 1, delivery of heroin, on guidelines of 27 to 33 plus or minus nine, I will sentence in the aggravated range to three-and-a-half to ten years incarceration with costs imposed. On Count 2, use and possession of drug paraphernalia, six months to one year incarceration to be served in a state correctional system concurrent with Count 1 with costs imposed. And Count 3, designer drug, on guidelines of 12 to 18 months plus or minus three, I will sentence in the aggravated range of one year and nine months to five years to be served in a state correctional system with costs imposed consecutive to Count 1. On Count 4, driving under suspension, as a tenth offense, the Court cannot disregard it within the context of all of the other extraordinarily serious matters before it. And you're sentence[d] to a six-month period of incarceration, maximum fine, which is $1,000 and costs, and that will be concurrent with Count 1. On Count 5, criminal conspiracy, on

- 13 -

guidelines of 27 to 33 months, plus or minus nine, I will sentence in the aggravated range to three-and-a-half to ten years incarceration concurrent with Count 1.

*Id.* at 39-45. The trial court clarified that the sentence for Count 4, driving while under suspension, was three months to six months. *Id.* at 46.

Appellant filed a timely, counseled motion to modify his sentence. Therein, Appellant averred the trial court abused its discretion in (1) failing to consider fully the sentencing guidelines, (2) failing to provide adequate reasons for imposing sentences in the aggravated range, (3) failing to sentence in accordance with 42 Pa.C.S.A. § 9721 by dismissing Appellant's genuine show of remorse, proactive assistance while he was in prison, history of PTSD, and childhood sexual abuse.

By order entered on December 12, 2017, the trial court indicated that it was clarifying the sentence to note that "[t]he sentence imposed on Count 1 of the instant Docket should have been made consecutive to the sentence imposed on [an unrelated docket number]." Trial Court Order, filed 12/12/17, at 1. In a separate order entered on December 12, 2017, the trial court denied Appellant's motion to modify his sentence. This timely, counseled appeal followed. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant contends the trial court abused its discretion in failing to sentence him in accordance with 42 Pa.C.S.A. § 9721 by improperly focusing on the gravity of the offense without proper consideration of Appellant's rehabilitative needs. He also contends the trial court erred in

imposing sentences in the aggravated range for Counts one, three, and five without stating adequate reasons on the record for the sentences.[2]

Appellant's claims present a challenge to the discretionary aspects of his sentence. When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *See Commonwealth v. Moury*, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted).

Here, Appellant filed a timely notice of appeal and preserved his issues in his motion for reconsideration.[3] His brief contains a separate Rule 2119(f) statement, and his issues present a substantial question permitting our review. *See Commonwealth v. Riggs*, 63 A.3d 780 (Pa.Super. 2012);

---

[2] We note that Appellant entered a non-negotiated guilty plea, and, thus, he is not precluded from raising challenges to the discretionary aspects of his sentence. *Commonwealth v. Tirado*, 870 A.2d 362, 365 n.5 (Pa.Super. 2005).

[3] He also preserved his issues in his court-ordered Pa.R.A.P. 1925(b) statement.

***Commonwealth v. Booze***, 953 A.2d 1263 (Pa.Super. 2008).  Accordingly, we shall proceed to review the merits of Appellant's sentencing claims.

It is well-settled that:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Gonzalez***, 109 A.3d 711, 731 (Pa.Super. 2015) (quotation omitted).

"Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the 'minimum possible' confinement." ***Moury***, 992 A.2d at 171 (citation omitted).  In reviewing the sentence, an appellate court shall have regard for: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission.  ***See*** 42 Pa.C.S.A. § 9781(d)(1)–(4).  These general standards mandate that a sentencing court impose a sentence "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b).

- 16 -

In the instant matter, the record demonstrates that the trial court had the benefit of a PSI. We have stated that:

When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. . . .Where the sentencing court had the benefit of a [PSI], we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

*Moury*, 992 A.2d at 171 (quotation marks and quotations omitted).

Moreover, as the trial court relevantly explained in its opinion with regard to its consideration of the factors under 42 Pa.C.S.A. § 9721:

In addition to properly considering the required sentencing guidelines, the court carefully crafted and imposed an individualized sentence which reasonably reflected the magnitude of [Appellant's] convictions. The court's understanding of the requirements of 42 Pa.C.S.A. § 9721 is clear, as it indicated that a sentence must be "based on the severity of the crime, its impact on the victim…and the broader community as a direct and indirect victim, the level of rehabilitation that [the court can] glean from what is before [it], as well as [Appellant] as the individual." N.T., 12/18/17, [at] 41. Here, the sentence imposed upon [Appellant] was consistent with the protection of the public, the gravity of the offenses as they relate to the victim and the community, and the rehabilitative needs of [Appellant].

With respect to the protection of the public and the gravity of the offenses as they relate to the victims and the community, the court stated, "there is so much here that is outright distressing in terms of [Appellant's] contempt for society, for the laws of society, for a safe society, and for the protection of society." *Id.*

\*\*\*

With respect to [Appellant's] rehabilitative needs, [Appellant] has been heavily active in the criminal justice system for twenty-four years, and until this sentencing, the court had seen no indication of any sense of responsibility or acknowledgment of the necessity to abide by the law, or any hint of rehabilitation. The court noted at sentencing that the longest

- 17 -

periods [Appellant] has stayed out of trouble are those periods when he was in state prison.

\*\*\*

Finally, the court factored in the dire need to deter similar actions, and notes the enormity of the opioid crisis in Pennsylvania. Courts in the Commonwealth of Pennsylvania have consistently recognized that general deterrence is one of the five purposes of sentencing which a court is permitted to consider. Having seen it in its courtroom and neighborhood regularly, the court recognizes the deleterious effect heroin, Fentanyl, and synthetic cannabinoids have on this county.

Trial Court Opinion, filed 3/29/18, at 7-9 (citations omitted).

Based upon a review of the record, we conclude the trial court imposed a sentence that was consistent with the protection of the public, took into account the impact the crime had on the community, and considered the rehabilitative needs of Appellant as required by Section 9721(b).

Further, we find no merit to Appellant's claim the trial court failed to set forth adequate reasons for the imposition of sentences in the aggravated range for Counts one, three, and five. In this regard, the trial court indicated in its opinion that, as it explained during the sentencing hearing, it imposed aggravated range sentences after consideration of the need to protect the public from Appellant, the gravity of his offenses, and his rehabilitative needs. *Id.* at 10. The trial court noted it considered Appellant's criminal history, which spanned over 24 years, his anti-social behavior, and Detective Kelly's opinion that Appellant was an "upper level drug dealer." *Id.* at 10-11. The trial court further noted that it considered Appellant's alleged epiphany; however, in light of the magnitude of Appellant's criminal involvement and his

unconvincing effort to "justify decades of deadly and destructive activities," the trial court concluded sentences in the aggravated range were proper as to Counts one, three, and five. *Id.* at 11. As the trial court provided ample reasons for its sentence, we find no abuse of discretion.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/30/2018